781 So.2d 1205 (2001)
STATE of Louisiana
v.
Emmett D. TAYLOR.
No. 99-KA-1311.
Supreme Court of Louisiana.
January 17, 2001.
Opinion Granting Rehearing in part February 16, 2001.
*1209 Denise LeBoeuf, New Orleans, LA, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Gretna, LA, Gregory M. Kennedy, Allison L. Monahan, Rebecca J. Becker, Counsel for Respondent.
TRAYLOR, Judge.[*]
A jury convicted defendant, Emmett Dion Taylor, on one count of first degree murder for the murder of Marie Toscano, in violation of La.Rev.Stat. 14:30, and the jury determined that a sentence of death be imposed. On July 17, 1990, the trial judge sentenced the defendant to death in accordance with the jury's determination. On direct appeal to this court under La. Const. Art. V, § 5(D), the defendant appeals his conviction, assigning numerous assignments of error. We find that none of the assignments of error constitute reversible error,[1] and affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On February 18, 1997, at approximately 11:50 a.m., an African American male entered Rhodes Pharmacy in Marrero, Louisiana. After a short exchange with the store clerk, seventy-seven year old Marie Toscano[2] and the pharmacist, eighty-three year old Joseph Sunseri, the assailant pulled a gun, pointed it at Sunseri's waist, and demanded money. Sunseri instructed Toscano to comply with the demand, but instead, she ran toward the back of the store. The assailant pursued Toscano and shot and killed her.
Robert Lester, who had observed a man exiting a vehicle parked on the side of the pharmacy shortly before the shooting, gave the police a description of the vehicle and assailant. After learning of the shooting, two other witnesses contacted authorities and gave a description of a vehicle which they had observed in the vicinity of the pharmacy around the time of the attempted robbery and murder. Thus, the ensuing investigation of the crime focused *1210 on the vehicle, which was described as a 1978-79 Oldsmobile, "golden, cream, yellowish" in color with "spoke rims and gold kickers."
Captain Sam Chirchirillo of the Jefferson Parish Sheriff's Office went to the Jefferson Parish Jail to determine whether any inmates could provide him with any information regarding the vehicle. Captain Chirchirillo described the vehicle to Deputy Joseph Boudion, who recognized it immediately. Deputy Boudion informed Captain Chirchirillo that he had seen a vehicle fitting the description around the 1900 block of Betty Street in Marrero. He also told the Captain that, although he had seen several individuals driving the vehicle, it belonged to an individual named "Terrance."
Officers proceeded to the area described by Deputy Boudion and spotted a car matching the description. After he was stopped, the driver of the vehicle identified himself as Terrance Dumas. As the officers approached Dumas, the defendant approached and informed the officers that Dumas had just dropped him off at his residence. After administering Miranda warnings to both men, the officers asked them if they would be willing to go to the detective bureau for questioning. Both men agreed and were transported to the station.
Approximately two hours after being taken to the station, defendant executed a waiver of rights form and made a taped statement denying involvement in the crime. He informed the officer that, at the time of the murder and attempted robbery, he and his brother were taking an employment-related physical examination. However, other witnesses failed to corroborate defendant's story, and he performed poorly on an ensuing polygraph examination. After being in police custody for nearly twelve hours, defendant was arrested and charged with murder.
The following afternoon, Lieutenant Kevin Smith went to defendant's cell to take a photograph. After entering the cell, Lieutenant Smith obtained the defendant's consent to take pictures and administered Miranda warnings. Defendant recognized the officer and said, "Man, Kevin, ... I ain't meant to kill that lady!" At that point, Lieutenant Smith cautioned the defendant about making any further statements and explained that he would have to obtain permission from his supervisor before he could continue the conversation with defendant. The defendant indicated that he wanted to speak with Lieutenant Smith further.
Later that evening, Lieutenant Smith returned to defendant's cell and escorted him to an area where they could speak. Once again, he Mirandized the defendant and acquired a written waiver. Nearly six hours later, the defendant made a taped confession of the robbery and murder. In the statement, the defendant claimed the shooting was accidental. It also stated that he threw the gun into the Harvey Canal as he fled the scene.
The next day, Smith returned to defendant's cell to seek defendant's assistance locating the murder weapon. After being Mirandized the defendant was taken to the detective bureau. When the defendant learned that divers were preparing to search the Harvey Canal for the weapon, he admitted that he had lied about the location of the gun. He gave another taped statement in which he attested that a "friend" had disposed of the weapon for him. Defendant did not reveal the identity of the "friend," and the murder weapon was never located.
On May 21, 1998, the jury found defendant guilty as charged, and on May 22, 1998, the jury determined that defendant *1211 should be sentenced to death. To support the death penalty, the jury found as aggravating circumstances: 1) the murder was committed during the commission of an armed robbery; 2) the victim was over the age of sixty-five years; and 3) defendant had previously been convicted of an unrelated armed robbery. In accordance with the jury's determination, the trial judge sentenced defendant to death. The trial court subsequently denied the defendant's Motion for a New Trial.

LAW AND ANALYSIS

Batson Challenges
In his tenth assignment of error, defendant claims that the State used its peremptory challenges to exclude jurors based on their African American race. Under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the state to come forward with a race-neutral explanation, and if a race-neutral explanation is tendered, the trial court must then decide, in step three, whether the defendant has proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); see State v. Collier, 553 So.2d 815 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. at 1771. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; See Batson, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so those findings are entitled to great deference by the reviewing court. Batson, 106 S.Ct. at 1724 n. 21.
The state exercised a peremptory challenge during the first panel of jurors to excuse Mary Porter. Defense counsel objected under Batson, and the state argued that it was not required to provide a race-neutral reason for exercising the challenge because there was no pattern of strikes established. The trial court agreed and did not require a race-neutral reason.
Following the examination of the fourth panel of jurors, the state peremptorily challenged Reverend Robert L. Davison. Again, the defendant objected under Batson and the state responded that although it had exercised five peremptory challenges, only one had been to a prospective African American juror. The trial court again declined to require race-neutral reasons for this challenge.
Shortly thereafter, the state exercised a peremptory challenge to Manuel Holmes. Defense counsel objected under Batson, and added that the state had challenged three of the four prospective African American jurors. The trial court requested that the state provide race-neutral reasons for the challenge. The prosecutor responded that Holmes:
is a juror who would get up there and say whatever he wanted though [sic] anybody wanted to hear. Every one of his answers were one line answers. I don't think he has a strong opinion one way or the other. And I think he would pretty much go along with what the other jurors wanted to do. And I don't believe he would be a strong juror for *1212 the state or the defense, especially for the state in this particular case based upon his answers to the state's questions as well as the defense's questions. He just strikes me very pleased to give an answer and he would not be a strong juror for the state.
The state added that it found Holmes inattentive to "what was going on."
The trial court then required the state to provide reasons for its earlier strikes to prospective African American jurors and the prosecutor responded regarding Davison:
... I think that somebody that is a reverend is going to be more forgiving when it comes to the penalty phase. He indicated that he could, [j]udge to be honest with you it's my own personal experience that people aren't involved, that aren't reverends in churches that at that point they may havebe a little more forgiving but with the guilty and the penalty phase and I don't think they would be a very strong juror for the state.
When the trial court asked the state to provide reasons for striking Porter, it responded that she was sympathetic to the defendant's socioeconomic background and was "very light" on the death penalty.
Defendant also objected under Batson when the state exercised a peremptory challenge to a prospective alternate juror, Darius Trufant. Regarding the potential juror, the state explained:
... [Mr.] Trufant lives in Harvey which is the same area that this occurred and also he may know the defendant. When I saw him come into the courtroom today he was speaking to several people that were in the courtroom when he first walked in and I did observe that. In addition to that the name Trufant does ring a bell to me in terms of prior cases that I've dealt with family members in Harvey that have some connections, some gangs in Harvey. I think there may be a connection there and I think with him knowing people involved in this case and given what I know about the Trufant name in Harvey, I think that is a sufficient reason.
Again, the trial court overruled the defense counsel's Batson objection.
Responses by the state qualify as race-neutral unless a discriminatory intent is inherent is inherent in the prosecutor's explanation. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). We find no error in the trial court's rulings upholding any of the state's use of peremptory challenges. The state validly chose to strike Davison according to religious beliefs. In addition, Trufant's potential connection to gang activity and Holmes' inattentiveness are also valid race-neutral reasons for the state's challenges. Finally, although the voir dire responses of prospective juror Porter are not markedly different from other venire-persons who actually sat on the jury, the defendant fails to show that the trial court erred when it accepted the state's raceneutral explanation for the strike. See United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir.1993) (noting that "[t]he reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated... [but]the judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race.").
Finally, one African-American sat on the jury and the state, which did not exhaust its peremptory challenges, used five to strike non-African-American prospective *1213 jurors. State v. Tart, 93-0772, p. 18, (La.2/9/96), 672 So.2d 116, 141 (acknowledging that "[a]lthough the mere presence of African American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing period may be considered."). In the present case, the defendant fails to demonstrate that the trial court abused its discretion when it accepted the State's race-neutral explanations for its use of peremptory challenges.

Exclusions for Cause
In his thirteenth and fourteenth assignments of error, the defendant contends that the trial court erroneously denied challenges for cause against two jurors, Funk and Motley, who the defendant claims were in favor of the death penalty. The defendant argues these jurors should have been excused for cause because they were unable to consider a life sentence.
An accused has the constitutional right to challenge jurors peremptorily, with the number of challenges fixed by law. La. Const. art. 1, § 17. Louisiana Code Crim. P. art. 799 provides the defendant in a death penalty case with twelve peremptory challenges. Therefore, when a defendant uses all of his or her peremptory challenges, a trial court's erroneous ruling depriving of a peremptory challenge constitutes a substantial violation of constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Robertson, 92-2660, p. 2 (La.1/14/94), 630 So.2d 1278, 1280; State v. Monroe, 366 So.2d 1345, 1347 (La.1978); State v. McIntyre, 365 So.2d 1348, 1351 (La.1978).
Prejudice is presumed when a challenge for cause is erroneously denied and the defendant has exhausted his peremptory challenges. To prove there has been reversible error warranting a reversal of the conviction and sentence, the defendant need only show: (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d at 1280-1281, citing State v. Ross, 623 So.2d 643, 644 (La.1993); State v. Bourque, 622 So.2d 198, 225 (La.1993); State v. Lee, 559 So.2d 1310, 1317 (La.1990); State v. Comeaux, 514 So.2d 84, 93 (La. 1987); State v. Brown, 496 So.2d 261, 263-64 (La.1986). In this case, the defendant exhausted all of his peremptory challenges. Therefore, we must ascertain whether any of the trial court's denials of challenges for cause were erroneous.
Reasons a juror may be challenged for cause are set forth in La.Code Crim.Proc. art. 797. The article provides:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2)The juror is not impartial, whatever the cause of his impartiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3)The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror at arriving at a verdict;
(4)The juror will not accept the law as given to him by the court; or
(5)The juror served on the grand jury that found the indictment, or on a petit *1214 jury that once tried the defendant for the same or any other offense.
Moreover, the proper standard for determining when a prospective juror may be excluded for cause because of views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The basis of the exclusion under La. Code. Crim. Proc. art 798(2)(a)(b), which incorporated the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror would either "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him...," or that the juror's attitudes towards the death penalty "would prevent or substantially impair him from making an impartial decision... in accordance with his instructions and his oath..." In a "reverse-Witherspoon" context, the basis of the exclusion is that the juror "will not consider a life sentence and... will automatically vote for the death penalty under the factual circumstances of the case before him..." State v. Robertson, 92-2660, 630 So.2d at 1284. Furthermore, if a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
The "substantial impairment" applies to the reverse Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id. 112 S.Ct. at 2229. The Morgan Court adopted the Witt standard for determining if a pro-death penalty juror should be excluded for cause. In other words, if the juror's views on the death penalty are such that they would prevent or substantially impair the performance of duties in accordance with the instructions on the oath, whether those views are for or against the death penalty, he or she would be excluded for cause.
A defendant in a capital murder case is entitled under the Sixth and Fourteenth Amendments to an impartial jury in both the guilt and penalty phases. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality. State v. Miller, 776 So.2d 396, 402 (La.2000), citing Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879).
Defendant argues that the trial court erred when it denied his challenge for cause to strike venire member Carol Funk because initially Ms. Funk's responses indicated that she would be unwilling to consider a life sentence for intentional murder. When examined by the state, Ms. Funk stated that she would consider the circumstances of the case, including mitigation evidence when deciding whether to vote for death or a life sentence. She specifically stated:
Well, if they proved that something like that really happened Somebody really had control or you know, alcohol, I really couldn't say that. If it was alcohol, he'd really have to be completely out of his *1215 mind with alcohol to put that as something causing him to do it.
The totality of Ms. Funk's colloquy states that she would be able to consider both mitigating and aggravating circumstances in deciding the appropriate penalty. When she was directly asked if she would automatically vote for the death penalty, she stated she would have to look at the whole circumstances.
Defense counsel attempted to exercise a challenge for cause to Ms. Funk based upon her statement that she could only consider the death penalty if the murder was intentional. The trial court denied the challenge. We agree with the trial court. Ms. Funk did state that she would consider the circumstances of the case in determining whether to vote for death or a life sentence. This court has held that prospective jurors in capital cases who expressly agree to consider both death and life sentences and to consider any mitigating evidence are properly not excluded for cause. State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396. The same issue presented by Ms. Funk in this case was presented in Miller, and as in that case, we find that the trial court did not err in denying the cause challenge.
Additionally, when examined by the state, prospective juror Paulette Motley responded that she could impose both the death penalty and life imprisonment and that she could consider both aggravating and mitigating circumstances to reach her verdict in the penalty phase. She said that she would not be influenced in her sentencing decision by the fact that it was an intentional killing, and that her sentencing decision would be based solely on the evidence. The trial court denied the challenge for cause based on Ms. Motley's responses concerning defendant's failure to testify, stating although Ms. Motley expressed doubts regarding defendant's failure to take the stand, "she didn't say it would make her vote one way or the other." We do not believe that the evidence when reviewed as a whole substantiates the defendant's claim that Ms. Motley would not accept the law as given to her by the court. A juror in a capital case must be willing to consider the imposition of both the death sentence and of a life sentence based on all the instructions given by the judge. The party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality, and the defense has not met its burden in proving that Ms. Motley lacks impartiality.
Additionally, we conclude that the trial court refusing to accept challenges for cause against Carol Funk and Paulette Motley is permissible in light of State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, which applies the appropriate basis for review. This court recently rejected, in Chester, the capital defendant's claim that the trial court erred when it denied his challenge for cause based on a prospective juror's inability to return a life sentence in a case of intentional murder. The circumstances involving the challenges in the present case to prospective jurors Funk and Motley are very similar to those in Chester regarding prospective juror Helen Galloway. In Chester, we summarized the juror's responses during voir dire as follows:
....Ms. Galloway responded to the State's questioning that she would listen to both the aggravating and mitigating circumstances in an appropriate case return a life sentence. Later, when questioned by defense counsel, she replied that there was a contradiction between specific intent and mitigating circumstances. When defense counsel attempted to explain mitigating circumstances, she replied that she understood *1216 them; however, her responses indicated that she was confused about the application of mitigating circumstances in a specific intent crime because she thought mitigating circumstances could apply only when the crime was accidental. However, she also stated in her colloquy that she would listen to both mitigating and aggravating circumstances, and "make a judgment based on what is presented."
97-2790, pp. 14-15, 724 So.2d at 1285-86. We decided that based on the entire colloquy, we did not find that the juror expressed "an unconditional willingness to impose a death penalty under any and all circumstances." Id. Accordingly, we determined that the trial court did not abuse its discretion when it denied the cause challenge. Id.
The voir dire in Chester resembled that conducted in this case in that the state did not rehabilitate jurors after the defense elicited testimony indicative of their commitment to vote for the death penalty. This court follows Chester, and finds that there is no abuse of discretion in that all the challenged jurors expressed the ability to consider mitigating circumstances before deciding on a sentence, and accordingly, did not demonstrate "an unconditional willingness to impose the death penalty under any and all circumstances." 97-2790, pp. 14-15, 724 So.2d at 1285-86. In light of Chester, the defendant's arguments that Ms. Funk and Ms. Motley should have been excluded have no merit.
Similarly, in assignments of error eleven and twelve, the defendant claims that the court erred when it denied cause challenges to prospective jurors Aimee Bonomolo and Carol Eaton. The defendant argues that Eaton and Bonomolo allegedly indicated in their initial responses during voir dire that they may be unwilling to impose a life sentence based on the possibility that the sentence would someday be commuted.
The record reveals that at the outset of voir dire, both Aimee Bonomolo and Carol Eaton indicated they could consider both life imprisonment and death when deciding the appropriate penalty for a defendant convicted of first degree murder. Also, when questioned by defense counsel, Eaton answered affirmatively when asked whether she could consider "a penalty less than death" in a case in which the state introduced evidence of at least three aggravating circumstances present in the defendant's case. Although Eaton stated that the possibility of a commuted sentence would weigh on her mind in determining the penalty, and that she might decide on a death sentence to avoid a pardon, she also stated, as did Bonomolo, that she could hold out for a life sentence in the face of opposition. Eaton specifically indicated that she could consider mitigating circumstances. Bonomolo also directly affirmed that she could impose a sentence other than death in a first degree murder case and that she "would be interested in all of the factors surrounding [defendant's] life" before she determined the appropriate sentence. Later during voir dire, defense counsel asked Eaton and Bonomolo whether they would return a death verdict to satisfy the victim's family members and both responded in the negative.
Defense counsel later challenged these two jurors for caused based on his belief that they would be more likely to impose a death sentence as a result of the possibility that the defendant's life sentence be commuted. The trial judge denied the challenges, stating that prospective jurors "only talk[ed] about the possibilities" of the parole system influencing their verdict. In capital cases, the trial judge makes personal observations of potential jurors during the *1217 entire voir dire, and a reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct voir dire by microscopic dissection of transcript in search of magic words or phrases that automatically signify juror's qualification or disqualification. See generally, State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396. Likewise, a prospective juror who indicates his or her personal preference for the death penalty need not be stricken for cause. State v. Lucky, 96-1687 p. 6 (La.4/13/99), 755 So.2d 845, 850. Not every predisposition or leaning in any direction rises to the level of substantial impairment. Id. at 850. We find that there is insufficient evidence in the record to establish that either Bonomolo or Eaton should have been excluded for cause.
Finally, in his fifteenth assignment of error, the defendant complains about the trial court's denials of his cause challenges to prospective jurors Robert Lacher and Donna Stogner based on their inability to consider mitigating circumstances during the penalty phase.
The record reveals that Lacher indicated it "would be very difficult" for him to return a life sentence in a case with the three aggravating factors present in the defendant's case. Throughout his entire voir dire colloquy, Robert Lacher continuously stated that his decision would be based on all the evidence and circumstances of the case. Although Lacher stated it would be difficult to consider both sentences for an intentional murder, he assured the court that he was not predisposed one way or the other to either a life sentence or death penalty. Lacher stated that he would be able to base his decision on the evidence, consider mitigating circumstances, and would not automatically vote for the death penalty. The juror indicated that although he would like to consider the defendant's upbringing in a violent environment as a mitigating circumstance, "it wouldn't mean much to" him. Counsel challenged Lacher for cause, stating:
...He said that he doesn't believe on blaming society, couldn't consider the mitigating circumstance of environment, and that for an intentional murder
The trial court denied the challenge.
As to Donna Stogner, when questioned by the defense about the mitigating circumstances of a violent upbringing, the prospective juror indicated she would have trouble considering it at sentencing because "[juror has] been there." Ms. Stogner indicated that she would base her decision on mitigating as well as aggravating circumstances, and would not automatically vote for the death penalty in the case of intentional murder. After a line of questioning by the defense, Ms. Stogner again reiterated that she would not automatically decide against a life sentence. Again, the district court denied the cause challenge based on her inability to consider the nonstatutory mitigating circumstances. Peremptory challenges were used against both Lacher and Stogner.
As this court previously noted:
There is no statutory or legal presumption in favor or any penalty or any mitigating circumstance, and individual jurors often, if not always, have their own inchoate or unarticulated predispositions. Such personal predispositions do not offend the law, provided that they do not "substantially impair" the juror's duty to follow the law. Not every predisposition or leaning in any direction rises to the level of substantial impairment. Significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role.
*1218 Lucky, 96-1687, p. 7, (La.4/13/98), 755 So.2d at 850. A juror may assign little weight or importance to any mitigating circumstance he does not consider significant in light of the fact that a defendant has been convicted of first degree murder. Ms. Stogner did not reject consideration of a specific mitigating circumstance, but simply stated that he or she might not assign much weight to that mitigator.
A party seeking to exclude a juror has the burden to demonstrate, through questioning, that a juror lacks impartiality. The determination is not how much weight a juror is willing to give any mitigating and aggravating circumstances established by the evidence, it is whether the juror is willing to consider mitigating evidence relevant to character and propensities of the defendant, which is the focus of capital sentencing hearing, and must be willing to fairly consider a life sentence. See Miller, 99-0192 (La.9/6/00), 776 So.2d at 402. A review of the entirety of the voir dire colloquies of these prospective jurors shows no abuse of the trial judge's discretion in denying the cause challenges against Mr. Lacher and Ms. Stogner. In light of the aforementioned rules, the challenges for cause to Mr. Lacher and Ms. Stogner lack merit.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either, (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La. Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. Rev. Stat. 15:567 B, immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. Rev. Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J., dissenting.
I dissent from the majority's holding that the state did not violate Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by exercising its peremptory challenges to exclude three out of four prospective African Americans from the jury.
The state claims that it because exercised a peremptory challenge to excuse Mary Porter she was sympathetic to defendant's socioeconomic background, and she was "very light" on the death penalty. In it's explanation for striking Ms. Porter, the state clearly mischaracterized her responses. When asked whether she would be able to consider both a life sentence and the death penalty, Ms. Porter unequivocally stated that she would consider both and added that she was not predisposed to either. Furthermore, Ms. Porter never stated that she would consider defendant's socioeconomic background "a big factor."
*1219 The state also peremptorily challenged Reverend Robert L. Davison. When asked to provide a race-neutral explanation, the district attorney responded that because he is a reverend, Davison would be "more forgiving when it comes to the penalty phase." The state's explanation makes no sense because the lone African American who did serve on the jury was also a member of the clergy. Furthermore, there is no evidence in the record to indicate whether the state inquired into the religious background of any of the other potential jurors.
Concerning Manuel Holmes, the state claims that it excused Holmes because Holmes was gave one word answers and seemed inattentive. However, the state's explanation is not credible because the record reveals that Dwade Clay, a Caucasian who was ultimately selected for the jury, gave the same monotonous short answers.
The state's explanation for excusing prospective alternate juror, Darius Trufant is also inadequate. Regarding the potential juror, the district attorney explained that he observed Mr. Trufant speaking to some people in the courtroom and that some of his family members were affiliated with gangs. However, the record is completely silent regarding Mr. Trufant's alleged "knowledge" of people in the courtroom. Neither the district attorney nor the trial judge inquired into the identity of the persons Mr. Trufant was seen speaking to. Furthermore, there is no evidence to support the district attorney's speculation regarding Mr. Trufant's and his family's affiliation to gangs. The state did not offer, and the trial court did not require, any proof of these allegations. Therefore, I can only conclude that they were pretextual.
I also disagree with the majority's conclusion that the trial court did not erroneously deny defendant's challenges for cause against veniremembers Carol Funk and Paulette Motley. When examined by the state, Ms. Funk stated that she would consider the circumstances of the case, including mitigation evidence when deciding whether to vote for death or a life sentence. However, during voir dire by the defense, Ms. Funk made it unequivocally clear that she would vote for the death penalty in the case of intentional murder.
In my view, Ms. Funk's Ms. Funk's pronouncement that the death penalty is the appropriate penalty when a person has committed "intentional" murder casts doubt on her ability to consider life imprisonment this case: where a conviction of first degree murder would necessarily require a finding of intent.
Additionally, when examined by the state, prospective juror, Paulette Motley, responded that she could impose both the death penalty and life imprisonment and that she could consider both aggravating and mitigating circumstances to reach her verdict in the penalty phase. Conversely, when defense counsel asked her whether she could vote for life imprisonment in a case in which the three aggravating circumstances urged in this case were present, Ms. Motley responded that she would not consider anything less than a death sentence when aggravating circumstances are present. Furthermore, Ms. Motley demonstrated an uncertainty about her ability not to hold defendant's failure to testify against him. Ms. Motley's responses make it clear that she would be inclined to vote for the death penalty in any case where aggravating circumstances are present. Her statement, indicating that she would not even consider any mitigating factors presented by the defense, shows that she was unwilling or unable to follow the law. Furthermore, her expression that she would be affected by defendant's *1220 failure to take the stand also indicate that she would be unable to adhere to the judge's instruction not to draw any inference concerning defendant's decision to exercise his Fifth Amendment rights. In sum, Ms. Motley made evident that she would not accept the law as given to her by the court.
For the aforementioned reasons, I respectfully dissent.
PER CURIAM.[**]
On application for rehearing, defendant contends the standard applied in our original opinion to determine whether a potential juror is properly excludable was language that was revised on rehearing in State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276 (on rehearing).
Defendant's application for rehearing is granted for the sole purpose of clarifying that, despite the language used in our original opinion, the standard applied to this case, to determine that the potential jurors were not properly excludable for cause, was indeed the standard we articulated in State v. Ross, 623 So.2d 643 (La. 1993).
The standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Thus, if a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. Ross, 623 So.2d at 644.
Applying this standard, and according due deference to the trial court's determinations, we find no error in the denial of the challenges for cause. The application for rehearing is otherwise denied.
NOTES
[*] Walter F. Marcus, Jr., Associate Justice, ad hoc, sitting for Justice Jeannette T. Knoll, recused.
[1] Assignments of error not treated in this opinion are addressed in an Unpublished Appendix to this opinion.
[2] There were several indications in the record that the victim was sixty-nine years old. However, according to the autopsy, Ms. Toscano, whose date of birth was listed as January 4, 1920 on the autopsy report, was seventy-seven years old.
[**] Walter F. Marcus, Jr., Associate Justice, ad hoc, sitting for Associate Justice Jeannette T. Knoll, recused.