ROSEMARY LEDET, Judge.
[ T This is a criminal appeal. The defendant, Leonard Nellum, appeals his conviction and sentence for the second degree murder of his mother, Darlene Nellum. Finding no error, we affirm.

STATEMENT OF THE CASE

On January 14, 2010, Mr. Nellum was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. At his January 20, 2010 arraignment, he pleaded not guilty. At a February 4, 2010 hearing, he was found competent to proceed. On May 14, 2010, the district court denied Mr. Nellum’s motion to suppress his statement. On June 22, 2010, the first day of trial, Mr. Nellum entered a plea of not guilty by reason of insanity. On the following day, the district court declared a mistrial after the jury was unable to reach a verdict. On August 24, 2010, Mr. Nellum was retried by another jury and found guilty as charged. On September 10, 2010, the district court sentenced Mr. Nellum to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. This appeal followed.

STATEMENT OF THE FACTS

|2On September 27, 2009, between 9:00 and 10:00 p.m., New Orleans Police Department (“NOPD”) Officer Joshua Car-wile and his partner, Officer Jimmy Peak, responded to a call regarding a shooting in the 100 block of N. Scott Street.[1] When they arrived at the scene, they observed a female victim lying on the sidewalk and Mr. Nellum standing fifty yards away from her body. Assuming Mr. Nellum was an innocent bystander,[2] Officer Carwile asked him what happened. Mr. Nellum replied: “I did it.”[3] Because he was under the impression it was a shooting incident, Officer Carwile asked Mr. Nellum where the weapon was located. Mr. Nellum replied that “[fit’s by her head.” Officer Carwile observed a “large brick” laying a couple of feet from the victim’s head.[4] At that point, he arrested Mr. Nellum and advised him of his Miranda rights. Officer Car-wile then turned Mr. Nellum over to his partner, Officer Peak, and went to check on the victim. Officer Peak escorted Mr. Nellum to the police car. Officer Peak testified that as Mr. Nellum was being walked to the police car he muttered something like “[g]ive me the death penalty.”
Detective Daniel Bagneris, who was working with a NOPD supplemental unit, responded to the scene to provide assistance. He testified that the call came Lout as a shooting incident. Upon arrival, he *123 noticed Mr. Nellum sitting in the back of the police vehicle “appearing to be agitated, kind of moving around the vehicle.” Knowing that the other detectives would have to interview Mr. Nellum later on, Detective Bagneris approached Mr. Nel-lum and attempted to calm him down. According to Detective Bagneris, he asked Mr. Nellum what was going on. Mr. Nel-lum replied that he and his mother had been arguing over a bicycle. Mr. Nellum further replied that his mother kept “getting in his face, wouldn’t stop, wouldn’t let up, and when he couldn’t take it anymore, he said he just kind of left, walked over to a tree, picked up some kind of large rock or brick and hit her over the head with it.”
Detective Bagneris testified that Mr. Nellum twice asked him about his mother’s condition and that he told him that he did not know, that he was not a doctor, and that he would check on her. Although Detective Bagneris believed that Mr. Nel-lum’s mother had passed away, he did not wish to antagonize Mr. Nellum any further by telling him that his mother was deceased. Instead, he returned and told him that “EMS is going to come out, they’re going to take a look at her.” Detective Bagneris testified that Mr. Nellum thanked him and appeared to be calming down. When another detective arrived, Detective Bagneris told Mr. Nellum that the detective would be talking to him, that he should tell that detective everything he had told Detective Bagneris, and that the detective would try to help him out. Mr. Nellum again asked how his mother was doing, and Detective Bagneris told him that EMS was working on her. Detective Bagneris then relocated to another part of the city on another matter.
The victim was pronounced dead on the scene.
l4At 10:35 p.m. on the night of the incident, NOPD Homicide Detective Richard Chambers conducted an interview of Mr. Nellum at police headquarters. Before beginning the interview, he advised Mr. Nel-lum of his Miranda rights; and obtained Mr. Nellum’s agreement to give a taped statement.[5] Detective Chambers acknowledged that Mr. Nellum never denied that he hit his mother and that at one point he said that he did not mean to hit her; however, Detective Chambers testified that “[Mr. Nellum] also said that they’d had physical altercations before.” Detective Chambers also acknowledged that during the interview Mr. Nellum asked about his mother’s condition and that at no point during the interview did Mr. Nellum indicate that he knew his mother was deceased. Indeed, Detective Chambers testified that “at the end I think he did state he was wondering how his mom was doing.”
In his statement, Mr. Nellum indicated that he lived with his mother and that he and his mother had previously had altercations and arguments. He stated that “we had physical fights and stuff like that.” When asked whether he had ever tried to hit her with anything before, he said: “probably so.” Immediately thereafter, he indicated that he could not remember “right off hand,” saying “[s]ometime but sometime I didn’t.”
As to the incident involving the brick, Mr. Nellum indicated that one could call the incident a misunderstanding. He stated that he hit his mother and that he “shouldn’t have.” He also stated that he struck her more than once and that he believed it had been more than twice. When asked why he struck her, he replied that he really did not know. He explained *124 that she was upset and was asking where |sher bicycle was. He replied in the affirmative when asked if the victim normally would “get upset about the bicycle.” He also replied in the affirmative when asked whether on this occasion when she approached him about the bicycle, his mother did so in the same way that she normally approached him. He added that “[s]he was who she was.” Mr. Nellum confirmed in his statement that the altercation took place both inside and outside the residence; he said “[w]e went outside.” After hitting his mother, Mr. Nellum stated that he returned inside and called several relatives, telling them that he hurt his “Mom” and to hurry up over. He then called the police, telling them to “hurry up officers to the house” to give some assistance to his mother.
Donald Hancock, who was the Orleans Parish Sheriffs Office’s telecommunications supervisor, testified that his job duties included overseeing all of the office’s telecommunications systems, including a “300-line inmate telephone system.” He explained that all inmate phone calls are recorded and that he was able to recover calls on request. At the request of the district attorney’s office, Detective Hancock recalled four telephone conversations that Mr. Nellum made from jail.[6]
In the first call, apparently made to his son, Mr. Nellum related the details of what transpired the day he killed his mother. He talked about his mother being angry over her bicycle being missing. She was furious because he apparently used the bicycle to ride to a Rouses Supermarket to get something she needed for cooking and left the bicycle there. He said that his mother was trying to take him Rout and that he hit her back, claiming he had to protect himself. He said that he physically restrained her, but she wriggled free. He stated that she “went” to pick up the brick, but she did not do so. He also stated that he “got mad and picked up the brick because mom didn’t ever want to stop.”
In his second call Mr. Nellum told the call recipient, a female who apparently was his sister, to just go with self-defense. He also said that his mother was screaming during the argument, that she was not supposed to be that upset, and that he hit her to “calm her down.” The third call was devoted almost exclusively to Mr. Nel-lum relaying messages from another inmate through his call recipient, apparently the same sister from the second call, who used her cell phone to call an individual to deliver messages from the inmate. In his fourth call Mr. Nellum told his call recipient that he “went with self-defense.” He also said that his mother kept on attacking him, telling him to bring it on.
Dr. Cynthia Gardner, who was qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy on the fifty-two year old female victim, Darlene Nellum. Dr. Gardner opined, to a reasonable medical certainty, that the fatal wound was a large laceration on the head with an underlying skull fracture. She explained that the other wounds the victim sustained were just scrapes and bruises.[7]
*125 Dr. Gardner indicated that there was evidence of two discrete impact sights— one on the temple that caused the skull fracture and one on the cheek — and thus two blunt trauma events. She testified that these wounds were caused by 17“blunt trauma, and specifically that the injury to the head was caused by a blow.” She explained that the underlying pattern of the skull fracture showed a “triangular shaped depressed fracture” and a pattern of bleeding in and around the brain. She opined that the cause of death was a single “[b]lunt trauma to the head — injury to the brain due to blunt trauma to the head.” She agreed that the injury was consistent with being hit over the head with a “large concrete rock.” Although she could not identify any specific object that caused the blows, she testified that it was some type of “blunt object” and not something sharp. As to how long it took for the victim to die, she testified that there was bruising and swelling around the brain and eyes and that those things take time. She thus opined that the victim did not die instantaneously, but most likely died very rapidly. She estimated that it took a few minutes, but not long. The toxicology report on the victim was negative.

ERRORS PATENT

A-review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER ONE

Mr. Nellum’s first assignment of error is the insufficiency of the evidence to support his conviction for second degree murder. This court recently outlined the applicable standard of review for sufficiency of the evidence in State v. Brown, 12-0626, pp. 6-8 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 570-71, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each | sfact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id. at 1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from the Jackson reasonable doubt standard; rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. *126 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
In the instant case, Mr. Nellum was charged with second degree murder, which is defined as the killing of a human being “[w]hen the offender has a specific intent to kill or to inflict great bodily-harm.” La. R.S. 14:30.1(A). Specific intent is that state of mind that exits when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow from his act. La. R.S. 14:10(1). Specific intent can be formed in an instant. State v. McElveen, 10-0172, p. 20 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033, 1052 (citing State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390).
The due process standard of review under Jackson does not sanction juror speculation if the evidence is such that a reasonable fact finder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La.4/1/05), 898 So.2d 1219, 1232 (citing State v. Lubrano, 563 So.2d 847, 850 (La.1990)). The 19testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
Mr. Nellum’s contention is that the evidence is insufficient to support a verdict of second degree murder; rather, he contends the evidence is sufficient to support only the lesser included offense of manslaughter.[8] Manslaughter is defined by La. R.S. 14:31, in pertinent part, as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed....
“ ‘Sudden passion’ and ‘heat of blood’ are not elements of the offense of manslaughter; rather, they are mitigating factors in the nature of a defense, which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors.” State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-38; State v. Thomas, 11-1219, p. 19 (La.App. 4 Cir. 12/6/12), 106 So.3d 665, 677, writ denied, 13-0013 (La.12/6/13), 129 So.3d 527. |lflA defendant has the burden of proving these mitigating factors by a preponderance of the evidence. State v. Dressner, 08-1366, p. 17 (La.7/6/10), 45 So.3d 127, 138; Thomas, 11-1219 at p. 19, 106 So.3d at 677-78.
*127 Mr. Nellum contends that an average man would be provoked by someone accosting him by “getting in his face,” invading his personal space, and refusing to back off. He contends that the act of “getting in someone’s face” is a physically aggressive act and thus greater than verbal abuse. He contends that it is the type of provocation that can cause an average person to temporarily lose control. For this reason, he contends the evidence presented at trial supports a conviction for only the lesser included offense of manslaughter.
The State counters that a rational trier of fact could have found that Mr. Nellum had the specific intent to kill or inflict great bodily harm when he struck his fifty-two year old mother multiple times in the head with a brick. It further counters that Ms. Nellum’s pestering did not constitute “provocation sufficient to deprive an average person of his self-control and cool reflection” to justify a responsive verdict of manslaughter. The State also notes that the mere fact that Mr. Nellum told the police his mother “got in his face” does not render the jury’s verdict irrational.
In support of his argument that the evidence is only sufficient to establish manslaughter, Mr. Nellum cites State v. Lombard, 486 So.2d 106 (La.1986), and State ex rel. Lawrence v. Smith, 571 So.2d 138 (La.1990).[9] Mr. Nellum’s reliance on those cases is misplaced. In both those cases, the defendant and victim fywere engaged in a physical altercation (fight) when the fatal blow was struck. Although “[pjhysical threats or actions on the part of the victim have been found to be sufficient provocation^] ... mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter.” State v. Free, 48,260, pp. 14-15 (La.App. 2 Cir. 11/20/13), 127 So.3d 956, 966 (citing State v. Wright, 42,956 (La.App. 2 Cir. 3/5/08), 978 So.2d 1062).
At the time of the incident involving the brick, Mr. Nellum and his mother were engaged in a verbal altercation over her missing bicycle. According to Mr. Nellum, his mother would not stop getting after him about it and kept “getting in his face.” Contrary to Mr. Nellum’s contention, his mother’s “getting in his face” cannot be equated with a physically aggressive act. Although Mr. Nellum stated in one of his jail phone calls that he struck his mother to calm her down, he also stated in one of the calls that he “got mad and picked up the brick because Mom didn’t ever want to stop.” Mr. Nellum also told Detective Bagneris at the crime scene that when he could not take it anymore, he *128 walked over to a tree, picked up the brick, and hit his mother in the head with it.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that Mr. Nellum struck his mother with the 112brick with the specific intent to kill or inflict great bodily harm upon her, killing her. There is a paucity of evidence that Mr. Nellum acted in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Thus, Mr. Nellum failed to prove by a preponderance of the evidence the mitigating factors that he did so in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO

Mr. Nellum’s second assignment of error is that the district court erred in granting the State’s challenge for cause as to prospective juror No. 20, Ms. Hughes. In support, he submits that the district court erred in construing her answers during voir dire to mean that she could not find Mr. Nellum guilty if he was sentenced to life imprisonment — the mandatory sentence for second degree murder to which Mr. Nellum ultimately was sentenced.
The erroneous allowance to the State of a challenge for cause does not afford the defendant a ground for complaint unless the effect of such ruling is the exercise by the State of more peremptory challenges than it otherwise would be entitled by law. La.C.Cr.P. art. 800(B). Contrary to the State’s contention, the record reflects that Mr. Nellum established that he is allowed to challenge the district court’s granting of the State’s challenge for cause of Ms. Hughes. An August 23, 2010 minute entry states that the State excused twelve jurors. The minute entry also lists the number of jurors excused by the defense, as well as the numbers of jurors excused by consent and for cause. Thus, the twelve jurors excused by the State were excused by the use of peremptory challenges; hence Mr. Nellum is allowed to |iachallenge the district court’s alleged erroneous granting of the State’s challenge for cause as to prospective juror, Ms. Hughes.
The State or a defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
[[Image here]]
(4) The juror will not accept the law as given to him by the court....
La.C.Cr.P. art. 797.
During voir dire of the first panel of prospective jurors, the prosecutor impressed upon the members of the panel that the mandatory life sentence for second degree murder, without probation, parole, or suspension of sentence, meant that, absent reversal on appeal, a pardon, or some other executive action, the defendant if convicted would spend the rest of his life in prison and die there. The prosecutor asked if anyone had a problem voting to find someone guilty of a crime knowing that the individual would spend the rest of his life in prison. Prospective juror Ms. Hughes raised her hand, and the following colloquy occurred:
MS. HUGHES:
*129 I would have some problems with that, really mixed emotions.
MR. PIPES [The Prosecutor]:
Mixed emotions. Well, do you think there are sets of circumstances where you could see yourself finding the defendant “guilty as charged” knowing that that vote would send him to jail for the rest of his life?
MS. HUGHES:
I wouldn’t want any part of that.
During defense counsel’s voir dire, the following colloquy occurred between him and Ms. Hughes:
114MR. HURTT [Defense counsel]:
Okay. As I’ve gone over before, it’s a very difficult duty that the community asks of you to perform. If [sic] Judge instructs you at the end of this case as to the elements of the crime, can you do that? If the Judge instructs you and you believe at the end of this case “I have no reasonable doubt as to the guilt of Leonard Nellum” can you vote “guilty?”
MS. HUGHES:
If I didn’t doubt it.
MR. HURTT:
“Guilty”; if any doubt you have — if you have no doubt that you consider reasonable. I mean, this all could be a sham—
MS. HUGHES:
Then I feel like I couldn’t even vote, I mean—
An in camera bench conference was subsequently held at which the parties exercised their challenges as to the first voir dire panel. The following colloquy transpired when the State challenged Ms. Hughes for cause:
MR. PIPES:
No. 20, Ms. Hughes. She stated that she would want “no part of that,” referring to the sentence of life. And then on rehabilitation, indicated that [if] she had no doubt, she thought she might, which is of course not the standard.
MR. HURTT:
Well, I wouldn’t phrase “no doubt” was reasonable, but I think that she was fully rehabilitated.
THE COURT:
I don’t think so, but I’ll give you that opportunity, okay, Mr. Hurtt?
MR. HURTT:
She said she wants no part in the case where the sentence would be life imprisonment — I don’t either.
THE COURT:
And I appreciate that. Let’s have her come in the back, okay?
Hi Ms. Hughes. Come on in. Just a follow-up to some of the responses you gave out front.
MS. HUGHES:
Okay.
J^MR. HURTT:
Ms. Hughes, you initially said you didn’t want to be part of [sic] case where [sic] life sentence was going to be imposed, and we’ve talked about it further, about difficulty. But the ultimate question is, if you believe the State has proven their case beyond any reasonable doubt, can you vote “guilty?”
MS. HUGHES:
It would be (inaudible) on me, but I mean, all I can do is try.
MR. HURTT:
Of course it would be difficult for all of us—
MS. HUGHES:
Yeah. That’s what — all I could do is try.
MR. HURTT:
Well, do you believe you could give an effort to be fair and bear the burden in accordance with the Judge’s—
*130 MS. HUGHES:
Yes, I could try.
MR. PIPES:
And ma’am, the fact that a vote of “guilty” would mean the defendant would be [sic] necessarily be sentenced to life at hard labor without the benefit of probation, parole, or suspension, would that prevent you in any way from finding him guilty?
MS. HUGHES:
That would weigh heavy on me, that he wouldn’t have any possibility of parole, that he does have to spend life in jail.
THE COURT:
Okay. Thank you, ma’am. You may step out.
MS. HUGHES:
Thank you.
THE COURT:
Granted as to Ms. Hughes.
MR. HURTT:
Note my objection.
Mr. Nellum submits that the basis of the State’s challenge of Ms. Hughes presumably was that she would not be able to follow the law and find someone | ^guilty regardless of the sentence they would receive. Mr. Nellum argues that Ms. Hughes never said that she would not be able to do so. This might be accurate insofar as that Ms. Hughes never used those precise words. Nonetheless, Ms. Hughes first said that she would have some problems with voting guilty knowing the defendant would spend the rest of his life in jail. She noted that she would have “really mixed emotions.” When further questioned whether there was a set of circumstances under which she could see herself finding the defendant, Mr. Nellum, guilty knowing that vote would send him to jail for the rest of his life, Ms. Hughes answered that she “wouldn’t want any part of that.” This answer, in effect, established that Ms. Hughes would not be able to vote guilty under any circumstances.
Mr. Nellum contends that defense counsel subsequently rehabilitated Ms. Hughes. When defense counsel asked her whether she could vote guilty if, at the end of the case the judge instructed her and she had no reasonable doubt as to Mr. Nellum’s guilt, she replied: “If I didn’t doubt it.” The State, however, is charged with proving a defendant’s guilt beyond “any reasonable doubt,” not beyond any doubt. Beyond any doubt is the standard that Ms. Hughes’ response suggested she would need to vote guilty. Thus, defense counsel failed to rehabilitate Ms. Hughes.
During the in camera challenge conference, defense counsel asked Ms. Hughes whether she could vote guilty if she believed the State had proven its case beyond a reasonable doubt. Ms. Hughes’s response was that “[i]t would be (inaudible) on me, but I mean, all I can do is try.” Defense counsel noted that it would be difficult “for all of us.” Acknowledging the difficulty, Ms. Hughes again replied that all she could was “try.” When asked if she believed she “could give an effort to be fair and bear the burden in accordance with the Judge’s [instructions],” |17she again said she “could try.” Finally, when the prosecutor asked Ms. Hughes whether, knowing that a vote of guilty would necessarily mean life imprisonment without the benefit of probation, parole or suspension of sentence, she could vote guilty, she replied: “That would weigh heavy on me, that he wouldn’t have any possibility of parole, that he does have to spend life in jail.”
The Louisiana Supreme Court discussed the applicable standard of review a trial court’s ruling on a challenge for cause in State v. Kang, 02-2812, pp. 6-7 (La.10/21/03), 859 So.2d 649, 653-54, stating:
*131 In State v. Lee, 93-2810 (La.5/23/94), 637 So.2d 102, this court reiterated the broad discretion afforded trial courts’ rulings on motions to strike jurors for cause because of their ability to get a first person impression of prospective jurors during voir dire. We characterized our jurisprudence as follows:
We have repeatedly held that a trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears, upon review of the voir dire examination as a whole, that the judge’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this Court reverse the ruling of a trial judge....
Lee, 93-2810 at p. 9, 637 So.2d at 108 (quoting State v. Passman, 345 So.2d 874, 880 (La.1977)).
This standard is utilized since the trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury veni-re as they respond to questioning. [State v.] Anthony, 98-0406 at p. 25, [(La.4/11/00),] 776 So.2d [376,] at 392. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. Lee, 93-2810 at p. 9, 637 So.2d at 108.
This court recently noted in State v. Hayes, 11-1232, p. 9 (La.App. 4 Cir. 10/24/12), 107 So.3d 668, 674-75, the following additional considerations in addressing this issue:
It is the party seeking to exclude a juror for cause who has the burden of demonstrating, through questioning, that the juror lacks | ^impartiality. State v. Taylor, 991311, p. 13 (La.1/17/01), 781 So.2d 1205,1218.
We note that a challenge for cause is not warranted when a prospective juror has voiced an opinion seemingly prejudicial, but after further inquiry, the juror demonstrates the ability and willingness to decide the case impartially according to the law and evidence. State v. Kang, 022812, p. 5 (La.10/21/03), 859 So.2d 649, 653. However, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. Id.
As we recently reiterated, “[a] trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion ... Only where it appears, upon review of the voir dire examination as a whole, that the trial court’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the defendant, will an appellate court reverse that ruling.” State v. Kirk, 2011-1218, p. 10 (La.App. 4 Cir. 8/8/12), 98 So.3d 934 (Citations omitted).
Upon review of the voir dire examination of Ms. Hughes as a whole, it cannot be said that the district court’s exercise of discretion in granting the State’s challenge of this prospective juror for cause was arbitrary or unreasonable, or was otherwise an abuse of discretion. Hence, this assignment of error lacks merit.

DECREE

For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Officer Peak testified that they were dispatched to the 100 block of N. Scott Street on a "medication assistance” call.

. Officer Carwile confirmed that it was unusual to arrive on the scene and have the individual who committed the murder standing on the scene. Officer Carwile also confirmed that he assumed, by the nature of Mr. Nellum’s behavior, that he could not have been the perpetrator.

. Officer Peak also confirmed that Officer Carwile asked Mr. Nellum what was going on and that Mr. Nellum replied that he had done it.

.Officer Carwile identified State Exhibit 1, a blown-up or enlarged photo, as a fair and accurate depiction of the scene; State Exhibit 2, en globo, as a fair and accurate depiction of the scene; and State Exhibit 3 as the murder weapon, the brick. The murder weapon was referred to by the parties as a “brick,” a "rock,”- or a "large piece of concrete.” For ease of reference, we refer to the murder weapon in this opinion as the "brick.”

. At trial, Detective Chambers identified a DVD and transcript of that taped statement as State Exhibits 5 and 6, respectively, which were published to the jury.

. Mr. Hancock identified State Exhibits 11 and 12, respectively, as an audio disc of calls requested and a call detail report relative to those calls. Transcripts of certain portions of those calls — State Exhibits 13(A) to (D) — were introduced as evidence and published to the jury.

. Dr. Gardner described Ms. Nellum's wounds, as documented in the autopsy report, as follows: a large injury to the right temple above the eye, which was a laceration — a tear of the skin; a blackening of both eyes; a large bruise of the right cheek; and abrasions on both shoulders, left wrist, left pinky finger, and right knee.

. Neither at trial, nor on appeal does Mr. Nellum argue self-defense. Indeed, at trial, his attorney expressly told the jury that "I do not feel I can stand in front of you and say a self-defense defense would be something that I could fairly ask you to return.” See La. R.S. 14:20(A)(1) (providing that a homicide is justifiable when committed in self-defense by one who reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger); see also La. R.S. 14:20(C) (providing that a person who is not engaged in unlawful activity and who is in a place where he has a right to be shall have no duty to retreat before using deadly force, and may stand his ground and meet force with force).

. In State v. Lombard, 486 So.2d 106 (La.1986), two teenagers were engaged in a fight. The victim punched the defendant, threw him against a metal rail, knocked him to the ground, and held him in a stranglehold. Panicking, the defendant pulled a knife and stabbed the victim twice. The Louisiana Supreme Court reduced the defendant’s second degree murder conviction to manslaughter.
In State ex rel. Lawrence v. Smith, 571 So.2d 133 (La.1990), a husband and wife were in a fight. The defendant-husband spent the evening drinking with friends. He called his wife between 4:30 and 5:30 p.m. and told her he would be coming home late. When he arrived home at about 10:00 p.m., his wife was angry. She attacked him and backed him into the kitchen. A fight ensued, and they engaged in a struggle on the kitchen floor. The defendant left the victim lying on the kitchen floor and went outside to smoke. When the defendant returned to the kitchen to check on the victim, he found her lying on the kitchen floor breathing heavily. The defendant moved the victim to her bed; however, the next morning he found her dead of a skull fracture. The Supreme Court reduced the defendant’s conviction to manslaughter, noting that "the victim initiated the fight, and the defendant retreated until he lost his temper and retaliated.” Smith, 571 So.2d at 136.