# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #045

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **3rd day of September, 2014**, are as follows:

**BY WEIMER, J.**:

2012-KA-2539          STATE OF LOUISIANA v. ERIC DALE MICKELSON (Parish of Caddo)
                      (First Degree Murder)

                      The defendant's conviction and sentence are reversed.  The case
                      is remanded to the district court for a new trial.
                      REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW
                      TRIAL.

                      JOHNSON, C.J., dissents and assigns reasons.
                      VICTORY, J., additionally concurs and assigns reasons.
                      KNOLL, J., dissents in part for reasons assigned.
                      WEIMER, J., additionally concurs with reasons.
                      GUIDRY, J., concurs and assigns reasons.
                      CLARK, J., dissents.
                      HUGHES, J. additionally concurs and assigns reasons.

## SUPREME COURT OF LOUISIANA

## NO. 2012-KA-2539

## STATE OF LOUISIANA

## VERSUS

## ERIC DALE MICKELSON

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT*
*FOR THE PARISH OF CADDO*
*HONORABLE SCOTT J. CRICHTON, JUDGE*

**WEIMER**, Justice.

A jury convicted the defendant, Eric Dale Mickelson, of one count of first degree murder and sentenced him to death. In his direct appeal under La. Const. art. V, § 5(D), the defendant raises numerous assignments of error, including the failure of the district court to sustain his challenge for cause of a *venire* member and the lack of sufficient evidence to sustain the conviction. We find the assignment of error regarding sufficiency of the evidence to be without merit. However, constrained by statutory requirements, we are obligated to find reversible error in the district court's failure to excuse a prospective juror for cause. Thus, we reverse and vacate the conviction and death sentence, pretermit discussion of the defendant's remaining assignments of error, and remand for a new trial.

### FACTS AND PROCEDURAL HISTORY

On July 11, 2007, eighty-six-year-old Charles Martin was strangled to death in his home in Shreveport, Louisiana. The victim was reported missing that day by his daughter, who summoned the police to the victim's home after repeated attempts to contact him proved unsuccessful. In speaking with police, the victim's daughter identified Beverly Susanne Arthur (Arthur) as someone who had been spending time with the victim and who had stolen prescriptions from him in the past. She reported that a rug and a small wooden barrel full of rare and foreign coins were missing from the victim's home and that an inspection of the victim's bank statement revealed checks that did not appear to have been signed by him.

The Shreveport Police Department began the investigation of the victim's disappearance by examining the suspicious bank transactions and discovered that Arthur had attempted to cash a check from the victim's account. After obtaining Arthur's address and a surveillance video of Arthur from the bank, a corporal was informed by bank personnel that another individual, identified as Michael Jones, had also attempted to cash a check from the victim's account.

Armed with this information, the corporal and his partner elected to conduct drive-by surveillance of Arthur's home on Torento Lane in Shreveport. As they were passing the house, they observed the victim's car in the driveway and a white male, later identified as the defendant, standing in the yard. The corporal exited the car from the passenger position and approached the individual he believed at the time to be Michael Jones, calling out "Michael." The defendant looked back over his shoulder nervously and reached for his abdominal area. Suspecting the defendant might be reaching for a weapon, the corporal drew his weapon, ordered the defendant to the ground, and handcuffed him. In the meantime, the other officer proceeded to

the front door of the house, from which two people, later identified as Arthur and her mother, were exiting.

Once the defendant was secured, it was determined that he was not Michael Jones. The defendant provided the officers with his name, and he was then informed that the officers were there because the car parked in the driveway belonged to the victim. The defendant explained that he and Arthur had dropped the victim off at a bus stop downtown. After summoning backup, the keys to the victim's car were obtained from Arthur. A search of the vehicle revealed nothing of note. However, after frisking the defendant a second time, the victim's identification and a key to the victim's car were found in the defendant's possession. With that discovery, the defendant and Arthur were transported to the police station in separate vehicles.

Before departing the scene, consent was obtained from Arthur's mother to search the premises. The coins missing from the victim's home and one of the victim's checks with the signature portion torn off were discovered in Arthur's bedroom.

In his interview at the police station, the defendant initially denied any knowledge of the victim's whereabouts, insisting that he and Arthur had dropped the victim off at a bus stop in downtown Shreveport and had not seen him since. However, after further questioning from detectives, the defendant admitted that he had helped Arthur break into the victim's house. He explained that he had opened a window in the back of the house to allow Arthur to climb in. She then let the defendant in through the front door. Once inside, Arthur knocked on the bedroom door trying to wake the victim. When the victim, who was hearing impaired, did not awaken, the defendant kicked in the bedroom door. It was then that the victim saw the defendant and, according to the defendant, the victim "wasn't real happy." The

3

defendant stated that he grabbed the victim by the neck and strangled him until he stopped moving. He then placed the victim's body in the bathroom while Arthur moved about the house collecting items. The defendant and Arthur eventually dressed the victim, placed his body in the back seat of his car, and drove the car to purchase drugs.

As the interview continued, the defendant provided more details about the victim's murder. Pursuant to the defendant's directions, detectives were able to recover the victim's body, which had been dismembered.

On September 5, 2007, a Caddo Parish grand jury returned an indictment charging the defendant with first degree murder, in violation of La. R.S. 14:30. Following the appointment of counsel, on September 7, 2007, the defendant entered a plea of not guilty.

Jury selection began on July 25, 2011. A panel of twelve jurors and two alternates was chosen, and trial commenced on July 30, 2011. The state concluded the presentation of its case on August 2, 2011. The defense rested its case the following day after calling a single witness, a forensic pathologist. Following deliberations later that day, the jury returned the unanimous verdict of guilty on the count of first degree murder.

The penalty phase commenced on August 4, 2011. The next day, the jury unanimously returned a verdict of death, finding the following aggravating circumstances: (1) the defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary and a simple robbery; and (2) the victim was sixty-five years of age or older. See La. C.Cr.P. art. 905.4(A)(1) and (10). The district court formally sentenced the defendant to death for the first degree murder of

4

Charles Martin. This direct appeal, in which the defendant asserts a total of twenty-nine assignments of error, ensued.

## LAW AND ANALYSIS

*Sufficiency of the Evidence*

Although we ultimately conclude on other grounds that the defendant's conviction and sentence must be reversed and the case remanded for a new trial, we begin our analysis by addressing the sufficiency of the evidence assignment of error because the lack of sufficient evidence to sustain the conviction would entitle the defendant to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40 (1981). See **State v. Maxie**, 93-2158 (La. 4/10/95), 653 So.2d 526, 531.

The defendant was indicted for first degree murder pursuant to La. R.S. 14:30. The relevant portion of this statute defines first degree murder as follows:

A. First degree murder is the killing of a human being:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simply robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

. . . .

(5) When the offender has specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.

To affirm a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational finder of fact to conclude that every element of the crime was proved beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 316 (1979); **State v. Martin**,

5

93-0285, p. 5 (La. 10/17/94), 645 So.2d 190, 194; **State v. Captville**, 448 So.2d 676, 678 (La. 1984).

In this case, the defendant contends that the state failed to present sufficient evidence to prove every element of the crime beyond a reasonable doubt. Specifically, he contends the state failed to present sufficient evidence that he had the "specific intent to kill or inflict great bodily harm upon [the] victim." In particular, he alleges that there was pervasive evidence of his intoxication at the time of the offense, evidence sufficient to support his contention that he was so intoxicated he could not form the requisite specific intent to commit the crime, and that the state failed to present any evidence to negate this fact.

Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant's actions. **State v. Broaden**, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362; **State v. Graham**, 420 So.2d 1126, 1127 (La. 1982). Specific intent may be formed in an instant. **State v. Cousan**, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390.

Voluntary intoxication will not excuse a crime, but it is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. See La. R.S. 14:15(2);[1] **State v. Legrand**, 02-1462, p. 7 (La.

---

[1] La. R.S. 14:15 provides, in relevant part:

> The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
>
> . . . .
>
> (2) Where the circumstances indicate that an intoxicated or drugged condition

6

12/3/03), 864 So.2d 89, 95-96. The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. See **State v. Smith**, 94-2588, p. 5 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, 1038, *citing* **State v. Davis**, 92-1623, p. 10 (La. 5/23/94), 637 So.2d 1012, 1020. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. See **Davis**, 92-1623 at 10, 637 So.2d at 1020.

In the instant case, there is no dispute that the defendant and Arthur ingested crack cocaine around the time of the crime. In his confession, the defendant repeatedly referenced the fact that he was "high" when he and Arthur went to the victim's home. In fact, the district court acknowledged that "[t]here's intoxication evidence all throughout the confession and there is evidence of cocaine use and abuse throughout the case with respect to [the defendant] and his codefendant." However, the question of whether that intoxication precluded the defendant from forming specific intent was a question to be resolved by the jury. See **Davis**, 92-1623 at 10, 637 So.2d at 1020.

In his statement to police, the defendant, while touting his cocaine use, never suggested that he did not know what he was doing when he went to the victim's house with Arthur. He explained that he opened a window to enable Arthur to enter the house and then waited for her to let him in through the front door. He told police that he kicked in the bedroom door so Arthur could talk to the victim, that the victim "wasn't real happy" to see the defendant, but that the victim "didn't have a very long

---

has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

time to look at [him]" because he quickly "rung [the victim's] neck." The defendant explained that he grabbed the victim by the neck and "just kind of locked up like a pit bull would lock up," until the victim quit moving. He then stated that he put the victim's body in the bathroom while Arthur removed items from the house.

Standing alone, the defendant's detailed description of the murder and the fact that he admitted choking the victim until he was sure he was dead could permit a reasonable trier of fact to conclude that the defendant had the specific intent to kill or inflict great bodily harm upon the victim, even while accepting the fact that he was high on cocaine at the time. This is especially true given the absence of even a self-serving statement from the defendant claiming he was too intoxicated to know what he was doing.[2]

While this evidence provides a reasonable basis for a jury to find proof of specific intent, it is not the only evidence of the defendant's motivation and state of mind at the time of the killing. The defendant explained to police:

> There was nothing I wanted. Did it all for [Arthur] because she wanted to. She wanted it. That's what she wanted to do. I dropped her off at the end of the street and she walked all the way down there and tried to get in that house and do that to [the victim] herself. But she couldn't do it. She didn't have the strength to do it. So she came all the way back up that ... street to get me to go down there and let her in that ... house. And when she got me manipulated to do that, of course, we went on a dope run first. By the time she got me manipulated to do that and got me in that ... house, she got me manipulated to bust the bedroom door open and manipulated enough to ring his ... neck for her. And I did. I did. She didn't.

---

[2] The defendant's actions immediately after the murder likewise support the conclusion that he was not too intoxicated to be able to form the specific intent to kill or inflict great bodily harm. The defendant told police that immediately after the murder, he helped Arthur clean the victim's house and that he then dressed the victim and placed him in the back seat of the victim's car. Further, after he left the victim's house, the defendant was able to plan and execute the disposal of the victim's body. He was able to conduct coherent conversations with Michael Jones and to clearly articulate his version of events to police interviewing him.

In addition to the defendant's statement, the state elicited testimony from a forensic pathologist that when a victim is being strangled, he will lose consciousness in ten to twelve seconds, but that it will take up to fifty more seconds of strangulation before he dies. The scientific evidence, thus, establishes that defendant strangled the victim for a significant amount of time after he no longer posed a threat of any kind.

The defendant admitted that he strangled the victim until he knew the victim was dead, an admission supported by the autopsy results, and he admitted that he did so, not because he was high on cocaine, but because Arthur asked him to. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have determined that the defendant had the specific intent to kill or inflict great bodily harm. This assignment of error lacks merit.

*Challenge for Cause*

The defendant contends the district court erred in denying his challenge for cause of prospective juror Roy Johnson. He argues that the this error required him to exercise one of his peremptory challenges to excuse Roy Johnson, thereby depriving him of the constitutional right to his statutory allotment of peremptory challenges.

Louisiana Const. art. I, § 17(A) guarantees to a defendant the "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." The number of peremptory challenges granted to a defendant in a capital case is fixed by law at twelve. La. C.Cr.P. art. 799. While the number and the manner of exercising peremptory challenges is provided through legislation, La. C.Cr.P. arts. 795, 799, and 799.1, the peremptory challenge is not merely a statutory right. This court has long recognized that when a defendant is forced to utilize a peremptory challenge to correct an error in denying a challenge for cause and thereafter exercises all available

peremptory challenges on other prospective jurors, a substantial right of the defendant, guaranteed by the Louisiana constitution, is affected. See **State v. Monroe**, 366 So.2d 1345, 1347 (La. 1978). In such instances, prejudice is presumed and automatic reversal of the conviction results. See also *Id.*; **State v. Campbell**, 06-0286, p. 70 (La. 5/21/08), 983 So.2d 810, 856, *citing* **State v. Robertson**, 92-2660, p. 3 (La. 1/14/94), 630 So.2d 1278, 1280, and **State v. Ross**, 623 So.2d 643, 644 (La. 1993).

The rationale behind Louisiana's automatic reversal rule was summarized in **State v. Jacobs**, 99-1659, p. 4 (La. 6/29/01), 789 So.2d 1280, 1283-84:

> In **State v. Robertson**, 92-2660, pp. 2-3 (La. 1/14/94), 630 So.2d 1278, 1280-81, we discussed the evolution of Louisiana's well-settled jurisprudential rule that prejudice is presumed when a defendant's challenge for cause is erroneously denied and the defendant exhausts all of his peremptory challenges. In that case, we noted that the Louisiana Code of Criminal Procedure (Acts 1966, No. 310) became effective January 1, 1967, and that Article 800 of the Code was intended, as the Official Revision Comment notes, to change the law by legislatively overruling[3] this court's earlier decision in **State v. Breedlove**, 199 La. 965, 7 So.2d 221 (1942). **Robertson**, 630 So.2d at 1280.
>
> In **Breedlove**, this court had held that there were three requirements for a denial of a defendant's challenge for cause to constitute reversible error: (1) an erroneous ruling by the trial judge refusing to sustain the defendant's challenge; (2) exhaustion of all of the defendant's peremptory challenges; and (3) the defendant was forced to accept an obnoxious juror, either the one that should have been excused for cause, or, if the juror was peremptorily challenged, a subsequent juror that defendant would have peremptorily challenged but for the fact that he had already exhausted his peremptory challenges. **Breedlove**, 7 So.2d at 226-227. In enacting Article 800, the legislature overruled **Breedlove** with regard to the third "obnoxious juror" requirement. *See* **Robertson**, 630 So.2d at 1280. Thereafter, a defendant need only show two things to constitute reversible error: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant; and (2) that the defendant exhausted all of his peremptory challenges. *Id.* at 1281.

---

[3] Strictly speaking, the doctrine of separation of powers prohibits the legislature from "overruling" judicial decisions. However, the legislature does have the ability to change the law, and, in this instance, it made a conscious decision to do so.

The reasoning for eliminating the "obnoxious juror" rule is that Louisiana, unlike many other states, constitutionally provides that the accused has a right to challenge jurors peremptorily, with the number of challenges being fixed by law.

Thus, under the legislatively enacted code as it currently exists, this court is constrained to hold that a defendant need make only two showings to establish error warranting reversal of a conviction and sentence: (1) the district court erred in refusing to sustain a challenge for cause; and (2) the defendant exhausted all of his peremptory challenges.[4] See La. C.Cr.P. art. 800.

In this case, the defendant exhausted all of his peremptory challenges. Accordingly, the sole issue presented for our resolution is whether the district court erred in denying the defendant's challenge for cause of Roy Johnson.

The defendant's challenge for cause in this case was based on Roy Johnson's refusal to consider relevant statutory mitigating circumstances at the penalty phase of the defendant's capital trial in the event he was convicted of first degree murder. In Louisiana there are two requirements necessary to challenge a juror for cause: (1) that "the juror is not impartial, whatever the cause of his partiality;"[5] and (2) that "the juror will not accept the law as given to him by the court." La. C.Cr.P. art. 797(2) and (4).

---

[4] Where a defendant ultimately exhausts all of his peremptory challenges, he must have had to use one of his peremptory challenges curatively to remove the objectionable juror or waive the complaint on appeal. **State v. Magee**, 11-0574, p. 27 (La. 9/28/12), 103 So.3d 285, 307, cert. denied, 134 S.Ct. 56 (2013); **Campbell**, 06-0286 at 71, 983 So.2d at 856; **State v. Blank**, 04-0204, p. 25 (La. 4/11/07), 955 So.2d 90, 113.

[5] Under the Sixth and Fourteenth Amendments of the U.S. Constitution, the defendant in a capital case is entitled to an impartial jury in both the guilt and penalty phase. See **Morgan v. Illinois**, 504 U.S. 719, 728 (1992). A prospective juror who would automatically vote for a life sentence is not impartial and, therefore, is properly excluded for cause (**Witherspoon v. Illinois**, 391 U.S. 510 (1968)), as is a juror who would automatically vote for the death penalty, as such a juror would fail to consider the evidence of aggravating and mitigating circumstances in good faith (for that prospective juror, the presence or absence of either aggravating or mitigating circumstances would be irrelevant) thereby violating the impartiality requirement. See **Morgan**, 504 U.S. at 729.

A juror in a capital case must be willing to consider the imposition of both a death sentence and a life sentence, based on all of the evidence and on the instructions given by the trial judge. **State v. Miller**, 99-0192, p. 8 (La. 9/6/00), 776 So.2d 396, 402. At the conclusion of the presentation of evidence during the penalty phase of a capital trial, "a juror must find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and then must *consider* any mitigating circumstances (statutory or otherwise) *before* determining whether or not the death sentence should be imposed." *Id.*, *citing* La. C.Cr.P. art. 905.3 and **Blystone v. Pennsylvania**, 494 U.S. 299, 307 (1990). "While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror *must* be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence." **Miller**, 99-0192 at 8-9, 776 So.2d at 402-03.

In **Miller**, we acknowledged the extreme difficulty faced by district courts in ruling on challenges for cause to a prospective juror, especially when the court is asked to determine whether it has been demonstrated, in a reverse-**Witherspoon**[6] challenge, that a prospective juror's bias in favor of the death penalty would substantially impair his or her ability to follow the law as instructed. **Miller**, 99-0192 at 14, 776 So.2d at 405. Recognizing that the line-drawing required of district courts faced with challenges for cause of prospective jurors who give equivocal or contradictory responses during *voir dire* is complicated and oftentimes daunting, we reiterated the well-settled principle that an appellate court should accord great deference to the district court's ruling on a challenge for cause, which is necessarily

---

[6] **Witherspoon v. Illinois**, 391 U.S. 510 (1968).

based, in part, on the court's personal observations during questioning. *Id.*, 99-0192 at 14, 766 So.2d at 405-06. As we recognized in **Miller**, a district court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the *voir dire* record as a whole reveals an abuse of discretion. *Id.*; **State v. Cross**, 93-1189, pp. 6-7 (La. 6/30/95), 658 So.2d 683, 686-87; **Robertson**, 92-2660 at 4, 630 So.2d at 1281.

However, while remaining cognizant of the broad discretion afforded a district court when ruling on challenges for cause, this court has cautioned that a prospective juror's responses during *voir dire* cannot be considered in isolation and that a challenge for cause should be granted, *even when a prospective juror declares his or her ability to remain impartial*, if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. **State v. Frost**, 97-1771, p. 4 (La. 12/1/98), 727 So.2d 417,423; **State v. Hallal**, 557 So.2d 1388, 1389-90 (La. 1990); **State v. Brown**, 496 So.2d 261, 264-65 (La. 1986); **State v. Jones**, 474 So.2d 919, 929 (La. 1985). Nevertheless, a refusal to disqualify a prospective juror on grounds he or she is biased will not constitute reversible error or an abuse of discretion if, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror demonstrates a willingness and ability to decide the case according to the law and the evidence. **Jacobs**, 99-1659 at 6, 789 So.2d at 1285; **Robertson**, 92-2660 at 4, 630 So.2d at 1281. As explained in **State v. Lee**, 559 So.2d 1310, 1318 (La. 1990):

> When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses

during her entire testimony, not just "correct", isolated answers; or, for that matter, "incorrect", isolated answers. [Citations omitted.]

In this case, the district court conducted *voir dire* in a bifurcated manner, initially calling prospective jurors in groups of thirteen to fourteen. With the exception of a single question posed by the district court, the questioning during *voir dire* was left to the attorneys for the state and the defendant. At the conclusion of the questioning for each group, the attorneys were called on to articulate their challenges for cause. After considering the arguments, the district court ruled on the challenge or, if the court felt clarification or rehabilitation was necessary, called the prospective jurors back for further questioning before ruling.

Roy Johnson was on the first panel of prospective jurors. On that panel were two other individuals with the same surname, both women: Deloris Johnson and Lekeeta Johnson.[7] Questioning was initiated by the state, with the prospective jurors being asked to indicate their attitudes toward the death penalty using a scale of one to five, with one indicating the individual would consider death as the only appropriate verdict for murder and five indicating the individual would never vote to impose the death penalty. Roy Johnson was the second prospective juror to be asked his feelings about the death penalty. He responded: "I ain't have no problem with it. ... Not for the death penalty if everything pointed to it, the evidence pointed to it, to what the particular person did." When the prosecutor probed further, explaining that he was not asking about the guilt phase of the trial, but the penalty phase, Roy Johnson remarked: "I feel if he is already found guilty it all depends on how the court is, you know, I mean, listening to all the evidence and everything, and he probably

---

[7] We cannot discount the possibility that the presence of multiple persons with the same surname on the *venire* panel may have inadvertently contributed to the ruling in this case through the unintended and accidental attribution of one Johnson's responses to those of another. At oral argument before this court, the state made precisely such a mistake.

14

is guilty, but you can say guilty in one stage and say it depends. It's certain things cause him to do it. So I couldn't say the death penalty there. ... I'm open to both ways, you know." According to Roy Johnson, who rated himself a three on the prosecutor's scale, "I have no problem with the death penalty one way or the other." To clarify, the prosecutor asked:

[State:] ... And, Mr. Johnson, is there anything else? Just before I get off of you I just want to make sure that both of these are open and there is not anything swaying you one way or the other. Is that right?

[Johnson:] No.

[State:] Until you hear the evidence, right?

[Johnson:] Until I hear the evidence.

On that note, the prosecutor turned his questions to the other prospective jurors in the group. The next time Roy Johnson was questioned, it was the defense's turn to probe his attitudes toward capital punishment.

[Defense:] What do you think about the death penalty?

[Johnson:] I think it's a good thing that's legal. If the person did it, you should have no doubts that the person did it.

Defense counsel then posed a hypothetical – a defendant who has no defense to his crime (*e.g.*, intoxication, insanity, retardation, self-defense, accident) is found guilty of first degree murder – and asked Roy Johnson what his verdict would be in that instance. Roy Johnson replied: "Then it is the death penalty ... If that's what happened, if that's what you are saying exactly happened, that's it." When questioned as to whether that verdict would be automatic, Roy Johnson replied: "No, it's not automatic. If that's what you are saying that's the way it was, if that's the way it was. I mean you didn't bring up more evidence. ... If there is no doubt in my mind after all the evidence and everything laid on the table, nobody else bring[s] nothing

15

else to change my mind, yes, I will give him the death penalty."[8]  The following

exchange occurred:

> [Defense:]   ...  Is there something that we could put on then [in the penalty phase] in terms of mitigating evidence that you would listen to?
>
> [Johnson:]   That would be up to you then.  I'm listening.
>
> . . . .
>
> [Defense:]   All right.  Do I have kind of an uphill battle then?
>
> [Johnson:]   No.  Just do your job.  That's it.
>
> [Defense:]   Well, before you were saying, you know, if he had the specific intent to kill then the death penalty.
>
> [Johnson:]   The death penalty, I still mean that, but now you are talking about you bringing something else to the table.  Let's find out what it is.  I mean I ain't going to just kill a man just because.  If somebody made a mistake this time and now they got new evidence on him and everything, I'm willing to listen.
>
> [Defense:]   All right.  Could you listen to the mitigating circumstances that the law puts out there?
>
> [Johnson:]   Yeah, I can listen.
>
> [Defense:]   For example, the guy had some mental illness or because he was drinking or doing drugs so that he couldn't decide to conform to the law.
>
> [Johnson:]   No, if it was something that he was born with, some kind of handicap or whatever, that's a different story.  **Drug, alcohol, whatever, that's no excuse for that**.  [Emphasis added.]

---

[8]  This line of questioning by defense counsel is consistent with the questioning expressly sanctioned by the Supreme Court in **Morgan**, *supra*.  The questioning, which is not tied to the specific facts of this case (an aggravated burglary and a robbery with a victim over sixty-five years of age, where evidence of intoxication was offered as a defense) is formulated simply for the purpose of ascertaining, as **Morgan** permits, whether the prospective juror would automatically vote for the death penalty in the event of a conviction.  **Morgan**, 504 U.S. at 735-36 ("[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on th[e] individual's ability to follow the law.  ... A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception.").

[Defense:]    All right. Do you understand that the law in ... setting out of mitigating circumstances includes the use of alcohol and drugs so that a person cannot conform his conduct to the laws?

[Johnson:]    **You assume that yourself. I don't see how, no reason why ... he shouldn't get the death penalty**. [Emphasis added.]

[Defense:]    Is what you are saying then that that's not going to be a mitigating circumstance for you?

[Johnson:]    **No, that's not**. [Emphasis added.]

[Defense:]    Nothing I could say about that?

[Johnson:]    **No, because if he did drugs or alcohol and went out and he had killed somebody, he did it on his own, and as far as to kill somebody that he didn't even know or nothing, yeah, I would give him the death penalty. He will come around and do the same thing to me the next time he get drunk if I be in his way**. [Emphasis added.]

Defense counsel then explained to Roy Johnson that the decision to impose a death sentence must be based on the prospective juror's individual judgment about what is right, but that the verdict has to be unanimous. Afterwards, the following exchange ensued:

[Defense:]    Is what you are telling me you are the kind of guy who is going to stick to his guns?

[Johnson:]    No, no, no, no, no, I'm not the kind of guy that's going to stick to his guns. After you bring something up to the table that show me that, hey, we got some new evidence, let's look at this here, I'm not – I'm not – I'm not hard ball, no.

Then, after once more explaining to Roy Johnson the different considerations at play in the guilt and penalty phases of a capital trial, defense counsel stated:

[Defense:]    The bottom line is you always got a choice. Even if you find five aggravating circumstances, you can still vote for life. Does that bother you at all?

[Johnson:]    No, it doesn't bother me.

[Defense:] Does it make you feel better?

[Johnson:] No. I'm going to do the right thing in my mind, period. **I mean you talking about the death penalty, yes, I would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody. Yes, I would do that**. [Emphasis added.]

Apart from being asked whether he could respect other people's opinions that might differ from his own, Roy Johnson was asked no further questions.

At the close of defense counsel's questioning, the attorneys were asked to lodge their challenges for cause. Defense counsel challenged Roy Johnson because he would not consider intoxication as a mitigating factor.[9] Although the district court elected to bring back two potential jurors for further questioning, or rehabilitation, before ruling on the challenges for cause lodged against them, neither the state nor the district court suggested a similar course for Roy Johnson. Instead, the district court denied the defense's challenge for cause, finding "no basis in my view for a cause challenge on Mr. Johnson, none." Reminding counsel that it is "inappropriate to take one isolated out-of-context statement of one prospective juror and micro-dissect it to the point of reaching an absurd result," the district court opined: "[L]ooking at Mr. Johnson and watching how he says, what he says and his manner and demeanor and looking at the totality of his testimony this afternoon I am convinced he would be extremely capable of being fair and impartial and neutral and would give [the defendant] a fair trial."

---

[9] La. C.Cr.P. art. 905.5 lists the circumstances that "shall be considered" in mitigation at a sentencing hearing in a capital case. It includes, as one of those circumstances, that "[a]t the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." La. C.Cr.P. art. 905.5(e). The mitigation defense of intoxication was a significant part of the defendant's defense as outlined previously.

18

The district court's denial of the defense's challenge for cause of Roy Johnson is premised on two findings: (1) it is inappropriate to take one isolated, out-of-context statement and micro-dissect it to the point of reaching an absurd result (indicating the court found only a single objectionable statement by Roy Johnson); and (2) Roy Johnson's demeanor – how he says, what he says – and the totality of his testimony indicate "he would be extremely capable of being fair and impartial and neutral." These findings, while reasoned and thoughtful, are, in the final analysis, simply not supported by the record when viewed as a whole.

A review of the *voir dire* reveals that Roy Johnson did not make just "one isolated out-of-context statement." To the contrary, Roy Johnson stated unequivocally on the record not once, but *five* times, that he would not consider evidence of intoxication as a mitigating factor in his determination of the appropriate sentence. Rather than retract from that statement, the last time he was questioned on the subject, he indicated that, not only would he not consider intoxication as a mitigating circumstance, he "would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody." And he emphasized, "Yes, I would do that," repeating his lack of equivocation. This final response to questioning indicates not just an *unwillingness* to consider intoxication as a mitigating factor in the sentencing determination, but a *predisposition* to vote for the death penalty if drugs or alcohol fueled the crime.

Moreover, while the district court does have the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury *venire* as they respond to questioning, giving the district court a distinct advantage in assessing the veracity and sincerity of the answers given, this unique perspective is primarily helpful in ferreting out unstated biases; not for downplaying stated predispositions.

19

In this case, insofar as the mitigating circumstance of intoxication is concerned, the prospective juror's responses never wavered. Facial expressions and vocal intonations notwithstanding, Roy Johnson was consistent in verbalizing an unwillingness to consider alcohol or drug induced intoxication as a mitigating circumstance in determining the appropriate sentence in this case. In fact, the "totality" of Roy Johnson's testimony during *voir dire*, far from supporting the conclusions related to the propriety of Roy Johnson serving as a juror, establishes that this prospective juror would not only not consider intoxication as a mitigating factor, but he would regard it as a factor in aggravation.

When the state opened the *voir dire* and questioned Roy Johnson generally about his views on the death penalty, his responses were measured and even-handed. Considered in the abstract, as to a penalty, Roy Johnson was "open to both ways." When the questioning became more specific, however, and the defense introduced the concept of mitigating evidence, and more particularly, the idea of alcohol or drug induced intoxication as a mitigating factor, Roy Johnson's responses were decidedly less even-handed.

When asked by defense counsel, "Could you listen to the mitigating circumstances that the law puts out there," Roy Johnson initially replied affirmatively. But when defense counsel probed further, explaining "[f]or example, the guy had some mental illness or because he was drinking or doing drugs so that he couldn't decide to conform to the law," Roy Johnson *voluntarily and without prompting or being led* qualified his prior response and segregated the type of mitigation evidence he *could listen* to: "No, if it was something that he was born with, some kind of handicap or whatever, that's a different story. Drug, alcohol, whatever, that's no excuse for that." When defense counsel explained that the law requires a juror to

listen to evidence of this mitigating circumstance, Roy Johnson replied: "You assume that yourself. I don't see how, no reason why ... he shouldn't get the death penalty." In response to the logical, follow up question, "Is what you are saying then that that's not going to be a mitigating circumstance for you," Roy Johnson stated unequivocally: "No, that's not." When questioned further, and asked whether, in a room with twelve people, he would stick to his guns, Roy Johnson did appear to ameliorate his stance, indicating that he would listen to new evidence. However, it appears that the new evidence he was referencing was evidence of a defense (*i.e.*, innocence) and that throughout the *voir dire* he remained confused as to the role of mitigating evidence. He stated: "Yeah, I think I do [understand the difference between the guilt and penalty phase] but if you got all the evidence and then you say the mitigating circumstances, if you looking at the mitigating circumstance[s] and you have all the evidence, I mean what's the difference?" And yet, despite this confusion, when it was explained by defense counsel that "[t]he bottom line is you always got a choice," Roy Johnson's final words were: "I'm going to do the right thing in my mind, period. I mean you talking about the death penalty, yes, I would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody. Yes, I would do that."

While Roy Johnson undeniably gave responses during *voir dire* that indicated, as a general proposition and in the abstract, that he would be willing to consider the specific facts and circumstances of the case and listen to all the evidence submitted before deciding the appropriate sentence, on the whole, his responses indicate that as to the mitigating circumstance of alcohol or drug induced intoxication, not only would he not consider alcohol or drug induced intoxication as a mitigating circumstance, but he was predisposed to vote for the death penalty if drugs or alcohol

21

influenced the crime. Indeed, his *final* statements clearly indicate a belief that death is the only appropriate penalty in such a circumstance.[10] The facts thus distinguish this case from those of **State v. Lucky**, 96-1687, pp. 3-4 (La. 4/13/99), 755 So.2d 845, 848-49, wherein the challenged juror stated that he would consider mitigating evidence, but would require that evidence to be substantial before he would consider recommending a life sentence. While, as **Lucky** illustrates, a juror in a capital case has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstances established by the evidence, the juror *must* be willing to *consider* mitigating evidence relevant to the character and propensities of the defendant (***Id.***; **Miller**, 99-0192 at 8-9, 776 So.2d at 402-03), a task Roy Johnson's answers indicate he would not perform.

The facts of this case are closer to those in **State v. Maxie**, 93-2158 at 5, 653 So.2d at 526. In **Maxie**, this court found that despite indicating "she could listen to the evidence, consider mitigating factors and impose a sentence of life imprisonment," "[o]n the whole," the prospective juror's answers indicated that she was predisposed to vote for the death penalty because of the "rape–murder" elements

---

[10] We ascertain nothing improper in defense counsel's *voir dire* examination. Defense counsel did not pose a hypothetical based on the facts of the case which sought a commitment or pre-judgment about issues to be resolved in the case, such as was deemed to be improper in **State v. Holmes**, 06-2988 (La. 12/2/08), 5 So.3d 42. In fact, defense counsel was prohibited by the district court from asking case-specific questions during *voir dire*.

Just before the *voir dire* questioning turned to Roy Johnson, the state objected to a defense question which sought to ascertain a prospective juror's opinion under a hypothetical tied to the facts of this case (the victim was a man in his eighties and after his death his body was dismembered). The district court sustained the state's objection, ruling (out of the presence of the *venire* panel) that defense counsel's line of questioning was improper. Roy Johnson was the next prospective juror examined after the state's objection was sustained, and the state did not object to any of the questions posed to Roy Johnson. Given the objections lodged just minutes before, it must be presumed that neither the state nor the district court found defense counsel's questions improper. It is not the province of this court to supply an objection neither the state nor the district court perceived to exist.

Moreover, we note that it was in response to a line of questioning that cannot in any manner be construed as calling for a pre-trial commitment as to issues to be resolved at trial ("Does it make you feel better?") that Roy Johnson *volunteered*, in his final answer on *voir dire*, that he would automatically vote for the death penalty if the defendant "was on drugs and alcohol and go[es] out and kill[s] somebody."

of the case before her. **Maxie**, 93-2158 at 19, 23, 653 So.2d at 536, 537. More importantly, the prospective juror "agreed, in her response to the final question posed, that the death penalty should be imposed once the defendant's guilt was established." *Id.*, 93-2158 at 23, 653 So.2d at 538. In **Maxie**, this *final response*, indicating an unwillingness to follow the law and to consider a life sentence under the facts of the case, *without any attempt at rehabilitation*, compelled the court's conclusion that a challenge for cause should have been granted by the trial judge. See *Id.*

**Maxie** is one in a long line of cases from this court which recognize that bias or impartiality on the part of a prospective juror can be removed by rehabilitation, but which find reversible error in denials of challenges for cause when, as in this case, there has been no attempt to rehabilitate a prospective juror whose unequivocal statements in *voir dire* evidence an inability to follow the law. See **Jacobs**, 99-1659 at 12, 789 So.2d at 1288 (trial judge was presented with challenges for cause to two jurors who had unequivocally stated on the record that they could only impose the death penalty, and instead of granting the challenges or attempting to rehabilitate the jurors through further questioning, simply denied the challenges. Noting that "[w]hile the jurors might possibly have been rehabilitated upon further questioning by the prosecutor, they were not," this court found reversible error in the denial of the challenges.); **Cross**, 93-1189 at 8, 658 So.2d at 687 ("A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where *subsequently, on further inquiry or instruction*, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. However, where, as here, there has been no attempt to rehabilitate [the prospective juror] subsequent to his remarks expressing his opinion in this area, the challenge for cause should have

23

been granted.") (citations omitted; emphasis in original); **State v. Sugar**, 408 So.2d 1329, 1331 (La. 1982) (noting that prospective juror's answers "preponderate in favor of the fact that she was *not* impartial," and that "[t]he juror might possibly have been rehabilitated upon further questioning by the prosecutor or the trial judge. Unfortunately for the state, she was not. Reversible error occurred when the defense challenge for cause was denied."). In such cases, the court has found the risk that the district court's denial of the defendant's challenges for cause might have "infected [defendant's] capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." **Morgan**, 504 U.S. at 736 (internal quotations omitted).

In this case, while Roy Johnson might possibly have been rehabilitated upon further questioning by the state or the district court, he was not, despite the fact that his final response with respect to a murder committed while under the influence of drugs or alcohol was clearly prejudicial to the defendant, whose confession revealed that he was high on cocaine when he killed the victim. As this court observed in **Robertson** in reversing a defendant's capital conviction and sentence on grounds that the district court erred in denying a challenge for cause to a juror who made clear he could not consider a life sentence in a case in which the defendant killed two or more persons:

> [A] potential juror who indicates that he will not consider a life sentence and that he will automatically vote for the death penalty under the factual circumstances of the case before him is subject to a challenge for cause by the defendant. It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear.

**Robertson,** 630 So.2d at 1284.

In the instant case, the district court relied heavily on Roy Johnson's "manner and demeanor" and the "totality of his testimony" to refute the defense's argument that Roy Johnson could not consider a life sentence under the factual circumstances of this case. Further, the district court dismissed Roy Johnson's unequivocal rejection of intoxication as a mitigating circumstance as an "isolated[,] out-of-context statement," but the record in this case belies this finding. Clearly, the district court's decisions as to the capabilities of a prospective juror are entitled to deference, but, in light of Roy Johnson's unequivocal responses during *voir dire* and the lack of rehabilitation, the district court's reliance on this prospective juror's demeanor to overcome his stated prejudice was an abuse of discretion.[11]

---

[11]  It is illuminating to consider Roy Johnson's responses in light of the responses of another prospective juror, David Bothwell, who was dismissed for cause on several grounds, among them "not being able to consider mitigation." The district court remarked that Mr. Bothwell's responses to questions about mitigation evidence,

> [C]ause[] me some concern with regard to his very strong viewpoint about drugs.
> Really the issue is can you weigh and consider these factors and do you have an open mind about them. He said it would be very difficult to consider mitigation, and I think he classifies himself as a 2. I think he is probably closer to a 1 and a half, maybe even a 1.

Mr. Bothwell volunteered in his *voir dire* responses that for him, the only mitigating circumstance,

> [W]ould be something that would be mental illness, in terms of something like that.
> You know, being drunk or drugged or being a follower versus a leader, you know, you made choices up to that point to lead you to that point whereas a mental condition the choices may be different. So to me that would be really about the only reason that the death penalty wouldn't be applied.

When instructed that the law requires a juror to actually listen to mitigation evidence, Mr. Bothwell indicated: "Oh, I will hear it, you know, but like I said, to me a lot of it goes back to the decisions that you make prior to the action." Later, when questioning was turned over to the defense, Mr. Bothwell testified that "it would be very difficult for me to consider" the mitigating circumstances of drugs, alcohol or being under the influence of another person. Mr. Bothwell's responses do not markedly vary from those of Roy Johnson, and while there were other factors (prior knowledge of case, and hardship) that led to Mr. Bothwell's dismissal for cause, his difficulty in considering mitigation evidence was one of the factors cited by the district court in excusing him from service.

## CONCLUSION

Other than this error, the record in this case reveals a district court that was learned, diligent, and ever-vigilant in attempting to meet its constitutional obligation to ensure that a fair and impartial jury was empaneled. However, Roy Johnson displayed an inability to follow the dictates of La. C.Cr.P. art. 905.5, which mandates intoxication "shall be considered" as a mitigating circumstance. Roy Johnson stated several times that he could not consider alcohol or drug induced intoxication as a mitigating circumstance in deciding the appropriate sentence, with his final words indicating he *would* impose the death penalty if drugs or alcohol fueled the crime. When a prospective juror holding such an opinion is not excused for cause, and the defense exhausts its peremptory challenges, as occurred here, there is reversible error. See La. C.Cr.P. art. 800. The defendant's conviction and sentence are reversed. The case is remanded to the district court for a new trial.

**REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL**.

26

09/03/14

SUPREME COURT OF LOUISIANA

NO. 2012-KA-2539

STATE OF LOUISIANA

VERSUS

ERIC DALE MICKELSON

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT*

*FOR THE PARISH OF CADDO*

*HONORABLE SCOTT J. CHRICHTON, JUDGE.*

**JOHNSON, C.J.**, dissents and assigns reasons.

I respectfully dissent. I disagree with the majority's finding that the district court committed reversible error in failing to excuse juror Roy Johnson for cause. After reviewing the voir dire transcripts, I do not find that Mr. Johnson's partiality is *clear cut* as found by the majority opinion, and I would affirm the trial court's ruling on this issue.

The majority opinion selectively reaches a finding of partiality by inferring that Mr. Johnson would not *consider* intoxication as a mitigating circumstance. However, a straightforward reading of the *voir dire* transcript, particularly the exchanges between Mr. Johnson and defense counsel, militate in favor of a conclusion that Mr. Johnson would *consider* intoxication as a mitigating circumstance, but would not afford that circumstance much *weight*. Reading all of Mr. Johnson's statements together, as this Court is required, the whole of his answers indicate that he would follow the law. Importantly, defense counsel never asked "*will you consider* intoxication as a mitigating circumstance?" Rather, defense counsel asked "is what you are saying then that [intoxication is] not going to be a mitigating circumstance *for you*?" in an attempt to find a juror that would apply the law *in a favorable manner*—or weigh the law in a favorable manner—for

the defendant. The entire colloquy indicates awareness that intoxication need be considered, but that Mr. Johnson simply was not buying what defense counsel was selling. Thus, I agree with the trial court that Mr. Johnson's adamancy that intoxication would not preclude him from giving a death sentence spoke to the weight he afforded it as a mitigating circumstance as opposed to a failure to *consider* it as a mitigating circumstance altogether.

My reading of the voir dire transcript is fully support by prior jurisprudence from this Court. This Court's holding in **State v. Taylor**, 1999-1311 (La. 1/17/01); 781 So.2d 1205 illustrates the distinction between a juror's refusal to *consider* a mitigating circumstance versus a juror's inclination to *weigh* a mitigating circumstance unfavorably in the eyes of the defendant. See also **State v. Miller**, 99-0192 (La. 9/6/00), p. 8-9; 776 So.2d 396, 402-03 ("While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror *must* be willing to consider mitigating evidence relevant to the character and propensities of the defendant . . . and must be willing to fairly consider a life sentence.") (emphasis original).

In **Taylor,** the defendant was found guilty of first degree murder and was sentenced to death. **Taylor**, 1999-1311; 781 So.2d 1205. The defendant argued that his challenges for cause to several jurors were improperly denied because the jurors in question were unable to consider a life sentence. **Id**. Defendant argued that juror Carol Funk indicated that she would be unwilling to consider a life sentence for intentional murder. **Id**. When examined by the state, Funk stated "Well, if they proved that something like that really happened – somebody really had control or you know, alcohol, I really couldn't say that. If it was alcohol, he'd really have to be completely out of his mind with alcohol to put that as something causing him to do it." **Taylor**, 1999-1311, p. 8-9; 781 So.2d 1205, 1214-15. This

court commented, "[t]he totality of Ms. Funk's colloquy states that she would be able to consider both mitigating and aggravating circumstances in deciding the appropriate penalty. When she was directly asked if she would automatically vote for the death penalty, she stated she would have to look at the whole circumstances." **Id**. This court further explained, ". . . prospective jurors in capital cases *who expressly agree to consider both death and life sentences and to consider any mitigating evidence are properly not excluded for cause*." **Id**. citing **Miller,** 99-0129; 776 So.2d 396 (emphasis added).

In this case, defense counsel, referring to intoxication as a mitigating circumstance, stated "And the law says you should listen to that." Mr. Johnson replied, "Okay, then I would listen." Later, when Defense counsel explains to Mr. Johnson that "the bottom line is, you have a choice. Even if you find five aggravating circumstances, you can still vote for life. Does that bother you at all?" he replied, "No, it doesn't bother me." In my view, it is clear that Mr. Johnson acknowledged he could consider both death and life sentences, and that a life sentence would be appropriate if he were to afford weight to any of the mitigating circumstances presented by the defense.

The last portion of **Taylor** is particularly instructive, wherein this Court discusses the impartiality of one juror who stated that a violent upbringing "wouldn't mean much to him" as a mitigating circumstance and another who said that "she would have trouble considering [a violent upbringing] because [she] had been there." **Taylor**, 99-1311, p. 12; 781 So.2d 1205, 1217-18. Both jurors maintained that they would consider a life sentence. This Court held:

> 'There is no statutory or legal presumption in favor of any penalty or any mitigating circumstance, and individual jurors often, if not always, have their own inchoate or unarticulated predispositions. Such personal predisposition do not offend the law, provided that they do not 'substantially impair' the juror's duty to follow the

> law. *Not every predisposition or leaning in any direction rises to the level of substantial impairment. Significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role.'*

**Id.** citing **State v. Lucky**, 96-1687, p. 7 (La. 4/13/99); 755 So.2d 845, 850 (emphasis added).

The majority relies heavily on **State v. Maxie**, 93-2158, p. 16-23 (La. 4/10/95); 653 So.2d 526, 535-38 a case that is easily distinguishable. Unlike Mr. Johnson, the challenged juror in **Maxie**, Ms. Rains, unequivocally stated that she would not consider a life sentence *at all*. Defense counsel asked, "Do you feel like [the death penalty] should automatically be imposed if [defendant] is convicted of first degree murder?" to which Ms. Rains responded, "Yes." **Maxie**, 93-2158, p. 18; 653 So. 2d 526, 535. Later, she stated, "If it is proven to me that he is guilty of this crime then you know I would vote for the death penalty." **Id**. After some rehabilitation, defense counsel again asked, "But do you feel like you have got to [give the death penalty] if rape-murder is proven?" to which Ms. Rains responded, "Yes." **Maxie**, 93-2158, p. 20; 653 So. 2d 526, 536. Defense counsel then stated "Bearing in mind you know what the Judge has said about looking at—" to which she said, "Right." **Id.** Defense counsel prodded Ms. Rains asking, "…The question remains, *what is your present disposition in terms of imposing the death penalty if [defendant] is convicted of first degree rape-murder*?" to which she replied, "*Death penalty*." **Maxie**, 93-2158, p. 21; 653 So. 2d 526, 537 (emphasis original). Defense counsel questioned Ms. Rains one last time:

> Defense: *But you feel right now that the death penalty ought to be imposed once the crime guilt—*
>
> Juror Rains: *Right.*
>
> Defense: *—gets established.*
>
> Juror Rains: *Once the crime guilt is established.*

4

**Id.** (emphasis original). After comparing voir dire questions and answers, I cannot conclude, as the majority does, that the facts of this case are close to those in **Maxie.** The voir dire in **Maxie** demonstrated *one inescapable* conclusion, while reasonable minds can differ on the partiality of Mr. Johnson.

This Court has also discussed this distinction in **State v. Robertson**, 92-2660 (La. 1/14/94); 630 So.2d 1278, 1282 (where challenge for cause was improperly denied when defense counsel asked *"will you automatically vote for the death penalty with regard for whether or not—uh—without regard to whatever can be put on in mitigation"* to which juror stated *"yes"*) (emphasis original), **State v. Odenbaugh**, 10-00268, p. 32 (La. 12/6/11); 82 So. 3d 215, 241 (where challenge for cause was properly denied where juror "did not state he would *automatically* impose the death penalty" if defendant was found guilty on both charges of first degree murder but instead, repeatedly stated he thought the death penalty would be "justified" when more than one person is killed) (emphasis added), and **State v. Carmouche**, 01-0405, p. 16 (La. 5/14/02); 872 S.2d 1020, 1033 (where this Court recognized that a juror's "indication that death is the only appropriate penalty for double murder" was similar to statements made by the juror in **Robertson**, but that in **Robertson**, the juror said he would "automatically vote to impose the death penalty regardless of any mitigating evidence" whereas this juror indicated "he would not vote for the death penalty if he did not believe it was merited" and that "he would consider both the good and bad circumstances" in making his sentencing decision).

Moreover, the majority invokes **Maxie** for the proposition that without rehabilitation, a juror must be struck for cause when his final statement hints at impartiality. This is a mischaracterization of **Maxie**. In that case, this Court considered that Ms. Raines "state[d] several times that the death penalty was the only appropriate punishment in this first degree 'rape-murder' case" and that her

5

partiality "was shown throughout the entire examination." **Maxie**, 93-2158, p. 23; 653 So.2d 526, 537-38. The **Maxie** Court looked at the entire colloquy, stating "*On the whole*, Ms. Rains' responses indicated that she was predisposed to vote for the death penalty because of the 'rape murder' nature of this case." **Id.** (emphasis added). In my view, the majority improperly focused on the final portion of Mr. Johnson's statements to reach its conclusion.

This court has clearly differentiated between the refusal to consider a mitigating circumstance and an inclination to weigh a mitigating circumstance one way. **Taylor**, 99-1311; 781 So.2d 1205. Here, the majority selectively parses out statements in a colloquy that, viewed in the aggregate, allows a reasonable person to conclude that Mr. Johnson was: (1) aware that he could vote for a life sentence; (2) understood the availability of mitigating circumstances to vote for a life sentence; and (3) understood that intoxication was a mitigating circumstance recognized by the law but (4) afforded it little weight.

In capital cases, jurors must be willing to consider both life and death sentences in addition to any aggravating and mitigating circumstances raised in the case. **Id**. Ultimately, "the party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality. . ." **Taylor**, 99-1311, p. 13; 781 So.2d 1205, 1217. I do not find the defense met this burden.

This Court has instructed that "a reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct the voir dire by microscopic dissection of transcript in search of magic words of phrases that automatically signify juror's qualification or disqualification." **Taylor**, 99-1311, p. 11; 781 So.2d 1205, 1217 citing with approval **Miller**, 99-0192; 776 So.2d 396. This Court is required to refrain from scrutinizing trial transcripts to distill otherwise ambiguous juror statements. "Likewise, a prospective juror who indicates his or her personal preference for the death penalty need not be stricken

6

for cause. Not every predisposition or leaning in any direction rises to the level of substantial impairment." **Taylor**, 99-1311, p. 11; 781 So.2d 1205, 1217 citing **Lucky**, 96-1687, p. 6; 755 So.2d 845, 850 (internal citations omitted).

Thus, in my view, we are compelled to respect the preferences of Mr. Johnson relating to the issue of intoxication as a mitigating circumstance and in turn, respect the determination of the trial court. Voir dire is a process inherently saturated with impressions and non-verbal cues that do not reach the pages of trial transcripts. "The broad scope of voir dire sometimes produces answers from a lay person that appear to be inconsistent, and the delicacy of this situation is an important factor underlying the rule that requires a reviewing court to accord substantial deference to the trial judge's rulings on challenges for cause relating to a juror's views of the death penalty." **Miller**, 99-0192, p. 10; 776 So. 2d 396, 403. To reach consistent outcomes, this Court's best avenue is to steadfastly adhere to the standard review we have set forth in these cases. The majority undercuts the deference this Court has shown in similar cases and erroneously finds reversible error. Finding the trial court did not abuse its discretion, I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## NO. 12-KA-2539

### STATE OF LOUISIANA

### VERSUS

### ERIC DALE MICKELSON

## ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT, PARISH OF CADDO, JUDGE SCOTT CRICHTON

**VICTORY, J., additionally concurs and assigns reasons.**

I concur in the majority opinion's holding that the district court erred in denying defendant's cause challenge of prospective juror, Roy Johnson. Johnson unequivocally and consistently expressed that he would not consider all relevant mitigating circumstances at the penalty phase of defendant's capital trial. He was never rehabilitated by the state or the court on this point.

However, I write separately to point out another error that occurred during the penalty phase. In 1999, the legislature amended La.C.Cr.P. art. 905.2(A) to provide that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, <u>and</u> <u>the</u> <u>victim</u>, and the impact that the crime has had on the victim, family members, friends, and associates." (Emphasis added). Because the character and propensities of the victim can be as much a focus of a capital sentencing proceeding under this statutory enactment as are the defendant's, the district court erred in excluding the testimony of Danita Larson about the victim's character and propensities.[1]

---

[1]This testimony is in the record because it was proffered by the defendant.

1

09/03/14

SUPREME COURT OF LOUISIANA

NO. 2012-KA-2539

STATE OF LOUISIANA

VERSUS

ERIC DALE MICKELSON

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT
FOR THE PARISH OF CADDO
HONORABLE SCOTT J. CRICHTON, JUDGE

**Knoll, J., dissenting in part.**

While I agree with the majority there was sufficient evidence to support defendant's conviction, with all due deference I strongly dissent from the majority's reversal of defendant's conviction. After carefully reviewing the voir dire examination, I find the trial judge did not abuse his broad discretion in denying defendant's challenge for cause of prospective juror Roy Johnson. Rather, the record clearly supports the trial judge's finding Mr. Johnson would be an impartial juror, despite *inappropriate* questioning by defense counsel.

In order to survive a challenge for cause, a prospective juror must be able to "accept the law as given to him by the court,"[1] including, in this case, consideration of mitigating circumstances as provided by La. Code. Crim. Proc. art. 905.5.[2] Defendant asserts Mr. Johnson's comments regarding drug and alcohol use show he could not "accept the law," because intoxication would not be a mitigating circumstance to him. As a reviewing court evaluating this assertion, we

---

[1] La. Code Crim. Proc. art. 797.
[2] La. Code Crim. Proc. art. 905.5 states in pertinent part: "The following shall be considered mitigating circumstances: … (e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication."

1

must be careful to "accord great deference to the trial judge's determination and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the jurors' qualification or disqualification." *State v. Miller*, 99-0192 (La. 9/6/00), 776 So.2d 396, 405-6; *citing State v. Lucky*, 96-1687 (La.4/13/99), 755 So.2d 845. This high level of deference is afforded to the trial judge because he or she is in the best position to make a determination based on a review of the entire voir dire as well as personal observations. *Miller*, 776 So.2d at 405; *State v. Cross*, 93-1189 (La.6/30/95), 658 So.2d 683. Applying this standard, I find the trial judge's denial of the challenge for cause of prospective juror Roy Johnson to be adequately supported by the record.

As this Court wrote in *State v. Holmes*, 06-2988, p. 46 (La. 12/2/08); 5 So.3d 42, 80, "Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical scenario which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case."[3] Yet, this is exactly what occurred in the present case: defense counsel elicited a pre-trial commitment from Mr. Johnson as to what penalty he would give under specific hypothetical circumstances.

> [Defense:] All right. Well let me pose a situation for you again. You have got a guy on trial for first-degree murder. You are a juror. You decided he did a specific-intent killing during a robbery let's say. There are no defenses to the crime. The guy who did it killed the person. He was not drunk. He was not insane. He was not retarded. He didn't act in self-defense. It was not an accident. He intended to do it, and he did it.
>
> [Johnson:] Then it is the death penalty.

Following this exchange, defense counsel improperly continued to probe and

---

[3] *See also, State v. Taylor*, 03-1934, (La. 5/25/04); 875 So.2d 58; *State v. Vaughn*, 431 So.2d 358 (La. 1983); *State v. Nero*, 319 So.2d 303 (La. 1975); *State v. Corbin*, 285 So.2d 234 (La. 1973). *State v. Williams*, 230 La. 1059, 89 So.2d 898 (1956).

modify the hypothetical, including inquiring about a scenario where the offender "was drinking or doing drugs so that he couldn't decide to conform to the law." When Mr. Johnson stated drugs and alcohol would be "no excuse," defense counsel immediately followed with a leading question, asking Mr. Johnson to commit on the issue of whether or not drug and alcohol use would be a mitigating factor for him: "Is what you are saying then that that's not going to be a mitigating circumstance for you?"

Mr. Johnson's answers on the subject of intoxication were made in response to this improper questioning on the part of defense counsel, without any knowledge on Mr. Johnson's part of the particular facts of the case. Furthermore, Mr. Johnson's statement "Drug, [sic] alcohol, whatever, that's no excuse for that [murder]," was in accord with Louisiana law. As the majority opinion correctly notes, "[v]oluntary intoxication will not excuse a crime." Slip op. at 6. Intoxication is *not an excuse*. On the contrary, under Louisiana law, intoxication is *immaterial* to the offender's culpability, except when the intoxication is involuntary or "precludes presence of a specific criminal intent or of special knowledge required in a particular crime." La. Rev. Stat. § 14:15.

Jurors in a capital case must consider relevant mitigating circumstances in deciding whether to hand down a death sentence at the penalty phase, including if "at the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." La. Code Crim. Proc. art. 905.5. This provision applies to a myriad of potential situations which could be afforded vastly different weight by jurors, from mental disorders, to drugging or other involuntary intoxication, to the voluntary decision of an offender, as was asserted by defendant in this case, to take cocaine. It is easy to understand how voluntary intoxication would be afforded little weight in comparison with other

circumstances to which this provision would apply. Although he imagined a scenario with a drunk offender rather than a drugged one, Mr. Johnson's concern a voluntarily intoxicated criminal will "come around and do the same thing to me the next time" is certainly a legitimate one with which many would agree.

Indeed, deciding to afford little or no weight to mitigating circumstances such as voluntary intoxication during the penalty phase is within a juror's discretion. *Miller*, 776 So.2d at 402-403 ("[w]hile a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by evidence, the juror must be willing to consider mitigating evidence.... There is a significant difference between a prospective juror's agreeing to consider evidence and the juror's determination of the importance of this evidence.") Defense counsel even appears to explain this to Mr. Johnson during voir dire, asking, "Do you understand that in making that decision you have to make your own individual judgment about what's right?"[4]

A juror in a capital case must be willing to consider the imposition of both a death and a life sentence based on the evidence presented and the trial judge's instructions. *Id.* However, even a juror with a strong predisposition towards capital punishment need not be disqualified, if the trial judge finds, in his or her broad discretion, "the juror's responses as a whole fairly support a conclusion that the juror would keep an open mind about penalty, no matter how grudgingly, until all of the evidence has been presented." *State v. Blank,* 04-0204 p. 30 (La. 4/11/07); 955 So.2d 90, 117, *citing Lucky,* 755 So.2d at 851. Because "the line-drawing in many cases of this type is extremely difficult," the trial judge is afforded great deference to determine a challenge for cause "on the basis of the entire voir dire, and on the judge's personal observations of the potential jurors during the questioning." *Miller*, 776 So.2d at 405-06; *citing State v. Cross,* 658 So.2d 683.

---

[4] Mr. Johnson replied, "That's right, that's right."

4

Throughout voir dire, prospective juror Johnson showed a consistent openness to applying the law to the facts of the case at hand. When asked if he was the "kind of person who would stick to his guns," he replied he was not and clarified he was not "hardball." He stated the death penalty would not be an "automatic" decision when defense counsel leadingly suggested it would be.[5] He repeatedly stated he would be open to evidence and new information introduced by counsel[6] and was clear he would respect the opinions of his fellow jurors.[7] On a scale of one to five, one being always in favor of the death penalty and five being always against it, Mr. Johnson rated himself a three, squarely in the middle. He stated he would not be swayed one way or the other until he heard all of the evidence,[8] and he said he could listen to the relevant mitigating circumstances.[9]

When Mr. Johnson said "Drug, [sic] alcohol, that's no excuse for that," defense counsel should have stopped and clarified that, in the context of

---

[5] [Defense:] And again that means that you would vote for the death penalty under those circumstances [where defendant has specific intent and is found guilty of first degree murder]?
[Johnson:] Yes.
[Defense:] And that would be an automatic situation.
[Johnson:] No, it's not automatic…

[6] [Defense:] Is there something we could put on then in terms of mitigating evidence that you would listen to?
[Johnson:] That would be up to you then. I'm listening.
[Defense:] Well, let's back up a step. You are listening. What does that mean? Does that mean you are still open [to imposing life imprisonment rather than the death penalty]?
[Johnson:] That means I listen at you, what you got to bring to the table.
[Defense:] All right. Do I have kind of an uphill battle then?
[Johnson:] No, just do your job. That's it.

[7] [Johnson:] People got different opinions. I give you my opinion. That doesn't stop other people from their opinion.
[Defense:] If somebody has that other opinion, would you still respect what that person is saying?
[Johnson:] I would respect them, yes.

[8] [State:] So it sounds like to my [sic] what you are telling me is that you are open to both outcomes, death and life.
[Johnson:] I'm open to both ways, you know.
***
[State:] … there is not anything swaying you one way or the other. Is that right?
[Johnson:] No.
[State:] Until you hear the evidence right?
[Johnson:] Until I hear the evidence.

[9] [Defense:] All right. Could you listen to the mitigating circumstances the law puts out there?
[Johnson:] Yeah, I can listen.

considering mitigating circumstances, intoxication is not an *excuse* but a factor for each juror to individually consider and assign weight to as a mitigating circumstance. Instead, defense counsel improperly solicited, via a leading question, Mr. Johnson's commitment intoxication would not be a mitigating circumstance. We should be wary of finding a trial judge abused his discretion in denying a challenge for cause on the basis of responses to such improper questioning, especially when the record shows the prospective juror otherwise expresses openness and willingness to consider evidence.

Finally, while it may be true some of Mr. Johnson's comments appear inconsistent, this is acceptable and, indeed, to be expected. As this Court explained in *State v. Miller,* "The broad scope of voir dire sometimes produces answers from a lay person that appear to be inconsistent, and the delicacy of this situation is an important factor underlying the rule that requires a reviewing court to accord substantial deference to the trial judge's rulings on challenges for cause relating to a juror's views of the death penalty." *Miller,* 776 So.2d at 403.

In denying Mr. Johnson's challenge for cause, the trial judge stated "watching Mr. Johnson and watching how he says, what he says, and his manner and demeanor and looking at the totality of his testimony this afternoon, I am convinced he would be extremely capable of being fair and impartial and neutral and would give Mr. Mickelson a fair trial." Under these circumstances, I find denial of defendant's challenge for cause is supported by the record, especially in light of defense counsel's improper questioning. I find defendant fails to show the trial judge abused his broad discretion, resulting in error meriting reversal of defendant's conviction.

6

# SUPREME COURT OF LOUISIANA

## NO. 2012-KA-2539

## STATE OF LOUISIANA

## VERSUS

## ERIC DALE MICKELSON

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT
FOR THE PARISH OF CADDO
HONORABLE SCOTT J. CRICHTON, JUDGE*

**WEIMER, J.**, additionally concurring.

I respectfully concur in the additional reasons assigned by Justice Victory identifying an error in the penalty phase involving provisions of La. C.Cr.P. art. 905.2(A).

SUPREME COURT OF LOUISIANA

No. 2012-KA-2539

STATE OF LOUISIANA

VERSUS

ERIC DALE MICKELSON

**GUIDRY, Justice, concurs and assigns reasons.**

I write separately to emphasize that "[i]t is the trial judge who is ultimately responsible for making certain that all prospective jurors understand the fundamental elements of a capital trial and their duties as jurors in a capital sentencing hearing." *State v. Jacobs*, 99-1659 p. 12 (La. 6/29/01), 789 So.2d 1280, 1288. "The trial judge has the constitutional obligation to ensure that a fair and impartial jury is empaneled, and that obligation can only be fulfilled if the prospective jurors are subject to a meaningful voir dire and well informed of what the law requires of them." *Id.* The dissent's suggested voir dire examination on mitigating factors is exactly what is missing in this case. In the absence of that type of inquiry by the trial court under the facts of this particular case, there is no way to be certain this juror would be fair and impartial and could have followed the law, which is the fundamental question in the jury selection process so as to ensure the accused's constitutional right to a fair trial.

09/03/14

SUPREME COURT OF LOUISIANA

NO. 2012-KA-2539

STATE OF LOUISIANA

VERSUS

ERIC DALE MICKELSON

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO
HONORABLE SCOTT J. CRICHTON, JUDGE

CLARK, Justice, dissenting.

This case presents another in a long line of cases where we are asked by a capital defendant to substitute our review of the voir dire testimony in the place of the trial judge who actively participated in the questioning of prospective jurors, was present to hear their vocal inflections and to see their facial expressions, and came to the conclusion the prospective juror could be fair and impartial. We are required by the law to give deference to the conclusions of the trial judge as to the *Witt-* and *Witherspoon-* readiness of prospective jurors. I dissent because I believe the majority fails to defer to the trial judge's conclusion with regard to prospective juror Roy Johnson where the trial judge was in a superior position to discern his impartiality *vel non*. After reading and considering the voir dire with regard to this prospective juror, I agree with the observations of the trial judge that Mr. Johnson was impartial and with the court's ruling denying the cause challenge raised by the defense.

I disagree with the majority's characterization of defense counsel's questioning as proper. *See* Slip Op., p. 22, n.10. This disagreement underscores the different conclusions to be reached by reading a cold record devoid of intonation, manner, and demeanor—in short, all the nuances of which the district

1

court is aware. The type of questioning engaged in by defense counsel with Mr. Johnson has been seen often in capital voir dire in other cases. Specifically, I find defense counsel repeatedly sought a commitment as to how Mr. Johnson would vote after hearing hypothetical situations with certain mitigating circumstances. Without knowledge of specific facts, or a context for actual mitigating circumstances, Mr. Johnson responded with answers describing how he would weigh those mitigating factors. In addition, defense counsel also sought to elicit from Mr. Johnson, without any context whatsoever, Mr. Johnson's own descriptions of what type of mitigating circumstances might move him to vote for a sentence of death or a life sentence. This court has repeatedly condemned this practice of putting lay persons "on the spot" and then microscopically dissecting their responses for legal error.

During questioning to determine whether a prospective juror can consider certain mitigating factors before determining the appropriate sentence, the particular phrasing of the question by the state and the defense may determine whether a sentence and/or conviction is upheld or is reversed. Such parsing of the responses on review of what is inherently a dynamic process of questioning and answering demeans the process of determining, simply, whether a prospective juror is impartial, and tends to reduce the goals of voir dire to mere gamesmanship.

In *State v. Ball*, 2000-2277, p. 11-24 (La. 1/25/02); 824 So.2d 1089, 1101-1111, we set forth an extended discussion of the voir dire testimony of three prospective jurors. The trial court denied cause challenges for each of these three prospective jurors, in part on the basis of the manner of defense counsel's questioning with regard to their consideration of mitigating circumstances. One of these prospective jurors' responses even included an agreement that she would "automatically" impose the death penalty. However, even this extreme was balanced against the remainder of her responses, which the majority fails to do

2

here.

During the prosecutor's questioning, Mr. Johnson indicated he would listen to all the evidence, and that even if the defendant was found guilty in one stage [the guilt phase], the penalty would still depend, since the evidence might show "it's certain things cause him to do it." Mr. Johnson indicated he was open to both the death penalty and life imprisonment. When asked whether "life is realistic [as a possible penalty]," he responded "right." He said he had "no problem with the death penalty one way or the other." He rated himself a "3," exactly in the middle on the 1-5 scale as to life imprisonment at one end and death penalty at the other. He stated both punishments were open for consideration, that there was nothing swaying him one way or the other, and that he would wait until he heard the evidence.

However, there were several times during questioning by defense counsel when Mr. Johnson was asked to commit or prejudge either specific facts or mitigating factors. Mr. Johnson was also asked to supply circumstances that would cause him not to vote for the death penalty. Throughout all of this, Mr. Johnson stated he would be listening to defense counsel and to anything brought before him for consideration. He denied that defense counsel would have an uphill battle for his consideration of mitigating factors. Instead of trying to determine whether Mr. Johnson *could* consider each of the factors (and not whether he *would* consider each factor, or *what weight* he would give them), defense counsel asked repeatedly for a commitment as to whether something would or would not be a mitigating circumstance for him.

In the midst of what I consider to be improper questioning by defense counsel, Mr. Johnson agreed or testified to the following: he would not automatically vote for death; he would listen to any mitigating evidence presented; the defense did not have an uphill battle; he was not going to vote to kill a man

"just because;" each juror had to make their own individual judgment about what was right, including mitigating circumstances; he understood the verdict had to be unanimous; he would not "stick to his guns," which in context meant he would not prejudge the matter and refuse to be moved no matter what was presented;[1] he could still vote for life imprisonment even if there were multiple aggravating circumstances and no mitigating factors; he was "going to do the right thing in his mind, period;" and he would respect other jurors' opinions.

I am not suggesting Mr. Johnson's voir dire testimony does not contain some answers that could be considered problematic, or that he did not show a predisposition to vote for the death penalty if the perpetrator of the offense was voluntarily intoxicated with alcohol or drugs. However, we have held "[n]ot every predisposition or leaning in any direction rises to the level of substantial impairment." *State v. Lucky*, 96-1687, p.7 (La. 4/13/99); 755 So.2d 845, 850. In light of the type of questioning in which defense counsel engaged him, I think Mr. Johnson's testimony is the type of "mixed bag" routinely seen by this court. It is not hard to see why the trial judge found Mr. Johnson to be impartial.

I believe the majority has strayed from our reasoning in *Lucky* where we analyzed the proper standard in determining whether substantial impairment is shown by these instances of a prospective juror's predisposition:

> Significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role. [citation omitted] When the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing

---

[1] This exchange is pretty representative of the questioning:

Defense counsel:  Is what you are telling me you are the kind of guy who is going to stick to his guns?

Mr. Johnson:  No, no, no, no, no, I'm not the kind of guy that's going to stick to his guns. After you bring something up to the table that show me that, hey, we got some new evidence, let's look at this here, I'm not - - I'm not - - I'm not hard ball, no.

4

in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause. While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification.

*Id.*, 96-1687, p. 7; 755 So.2d at 850-851.

In fact, defense counsel's manner of questioning Mr. Johnson was raised by the prosecutor at the bench conference on this prospective juror ("But Mr. Johnson was clear despite the line of questioning that seemed to disregard every previous answer."). With regard to Mr. Johnson's alleged inability to consider alcohol or drug consumption as a mitigating factor, the prosecutor argued:

> Mr. Johnson will clearly listen to all the mitigators, and what he was reaching was a conclusion about the voluntary consumption of alcohol, but if they are able to show them a drug condition that, you know, does meet whatever his criterion are, then he will consider it, but he was coming down on a specific fact pattern that, you know, I tend to agree with Mr. Johnson. You know, if I smoke a joint and go kill somebody, you probably, you know, would say that wouldn't really weigh very heavily with me. I think that's all Mr. Johnson is saying. And what Mr. Edwards is pointing out is that his specific words about drug and alcohol were that it was not an excuse, and he never specifically said it was not a mitigating factor he would not consider.

After hearing defense counsel's argument, the trial judge denied the defense's requested cause challenge in a strongly-worded ruling:

> Well, I'm ready to rule on Mr. Johnson. He is, I think, an extremely well qualified prospective juror. It is clear to me without any doubt he is very impartial and neutral.
> You know, one thing that's inappropriate is to take one isolated out-of-context statement of one prospective juror and micro-dissect it to the point of reaching an absurd result.
> The Supreme Court, and particularly Justice Harry Lemmon when he was there, cautioned us about that.
> And looking at Mr. Johnson and watching how he says, what he says and his manner and demeanor and looking at the totality of his testimony this afternoon I am convinced he would be extremely capable of being fair and impartial and neutral and would give Mr. Mickelson a fair trial.
> I think we would be lucky to have Mr. Johnson on the jury is my view of him. So there is no basis in my view for a cause challenge

on Mr. Johnson, none. Cause challenge denied.

Considering the manner of defense questioning with the totality of Mr. Johnson's responses, and the trial judge's strongly-worded endorsement of Mr. Johnson as an impartial juror based in part on factors only he could witness, I do not think the record supports a finding of an abuse of the trial court's discretion in denying the defense cause challenge at issue.

In light of the majority's holding, I offer the following suggestion to trial court judges, even those who are "learned, diligent, and ever-vigilant in attempting to ensure that a fair and impartial jury [is] empaneled," *slip op.,* p. 26, who wish to ensure that their rulings on cause challenges with regard to consideration of mitigating factors are not reversed on appeal. Considering the majority's talismanic emphasis on the "last" expression of the prospective juror, a trial judge, and not counsel, should ask each and every prospective juror a final question. After reading out a list of the mitigating factors, or discussing them, the trial judge should ask:

> Without telling me what weight you would give to any of these mitigating factors, or in what way they would influence your decision, can you consider them before making the determination whether life imprisonment or the death penalty is the appropriate punishment should the defendant be found guilty of a capital murder?

For these reasons, I dissent.

09/03/14

**SUPREME COURT OF LOUISIANA**

**No. 2012-KA-2539**

**STATE OF LOUISIANA**

**VERSUS**

**ERIC DALE MICKELSON**

**HUGHES, J., additionally concurs and assigns reasons.**

I agree with the majority opinion. This is a tremendously difficult case with which all the justices have invested much effort. We note that there were three Johnsons in the jury pool, and the issue is that the particular juror we are concerned with was not rehabilitated during voir dire to allow him to serve.

It is clear that this juror was honest and forthright and there can certainly be no criticism of him for speaking his mind, which was that he considered drug and alcohol use to be aggravating, and not mitigating, factors for which he would impose the death penalty. I am hard put to disagree. Unfortunately, the law is written a different way.